## THE GEORGE FARWELL et al. (five cases).

### (Circuit Court of Appeals, Second Circuit. July 25, 1900.)

#### Nos. 109–113.

1. MARITIME LIENS—REPAIRS AND SUPPLIES—REPRESENTATION OF OWNERSHIP BY CHARTERER.

A steamship company having its place of business in New York City through its officers procured repairs to be made and supplies furnished to a vessel in that port, representing that it was the owner of such vessel, although the vessel was in fact owned in Cleveland, and the company was in possession under a charter which required it to make all repairs and furnish all supplies at its own expense, and to keep the vessel free from liens. *Held*, that persons making repairs or furnishing supplies on such representations were not bound to make further inquiries as to ownership, but were justified in relying on such representation, and, where there was an express agreement for a lien, the vessel was bound thereby; but that, in the absence of such agreement, or where no inquiry or statement was made as to ownership, there would be no lien, although the repairs or supplies were charged to the vessel, the presumption being that credit was given to the supposed owner.

2. SAME.

A libelant who made repairs on such vessel under an agreement with the port captain, who had charge of the work, with the approval of an officer of the company, on a statement by the port captain that the vessel was owned by the company, and was "good for the bill," but who made no inquiries of the company, and no agreement with it for a lien, was not entitled to a lien therefor.

Shipman, Circuit Judge, dissenting as to the second point.

Appeals from the District Court of the United States for the Southern District of New York.

These cases come before this court on appeal by Nicholas J. Boylan and Syndenham Scott, the claimants, as owners of the steamship George Farwell, from decrees of the district court, Southern district of New York, sustaining libels filed against said steamship for repairs and supplies.

James Byrne, for appellants.
James K. Summers, for appellees Philip and others.
Edward G. Benedict, for appellee Pollock.
James F. Foley, for appellee Hoffmire.
Le Roy S. Gore, for appellees Tregarthen.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The owners of the steamship were residents of Cleveland, and on her stern, at the several times mentioned, appeared the words "George Farwell, Cleveland, Ohio." On November 17, 1898, she was chartered to the Manhattan Steamship Company, a corporation organized under the laws of the state of New Jersey, but doing business in New York City. The charter was for 24 months at $1,000 per month, with an option to purchase at a stipulated price. The Farwell was built for a freighter on the Lakes, and it was the intention of the charterer to overhaul her so that she would be fit to run with other steamers on a coastwise line which it expected to establish from New York to Southern ports. The charterer was to bear all expenses, including alterations, repairs, and addition, and agreed to keep her free and clear of all liens, incumbrances, and debts. The vessel was delivered to the charterer at Buffalo, was brought through the canals and St. Lawrence river, and reached the foot of Twenty-Fifth street, South Brooklyn, considerably damaged by sea perils encountered on the voyage. Upon her arrival at South Brooklyn parts of her engines and other machinery were taken down and removed from the vessel, and she went out of commission. Her supply of coal was taken out, in order that changes might be made in her bunkers, and that new bulkheads might be put in. In this condition she was towed from South Brooklyn to East Fourth, borough of Manhattan, and while at the foot of East Fourth street she was further dismantled. Her system of iron piping was removed, to be replaced with copper. While she was in this condition, and while this work was going on, the claims of the libelants accrued. All of the work claimed for and all of the supplies and materials were furnished (except the supplies furnished by Nieman) while the steamship was lying at the foot of East Fourth street.

The following propositions seem to be established by authority:

(1) The charterer of a vessel becomes the owner pro hac vice to such an extent that he may bind the ship for repairs and supplies, when there is nothing in the charter restricting him in that particular.

(2) "Neither reason nor public policy forbids the owner and the charterer from making" an agreement that the charterer shall supply such things, and keep the ship free of liens therefor. The Kate, 164 U. S. 465. 17 Sup. Ct. 138, 41 L. Ed. 516.

(3) If the person furnishing the labor or supplies knows the terms of ch a charter, he cannot have a maritime lien upon a foreign vessel w .en he furnishes such labor and supplies upon the order of the charterer or the charterer's servants, even though he charges them to the vessel. The Kate, supra.

(4) The same rule will apply even if the person so furnishing labor and supplies has no knowledge of the contents of the charter party, "If the circumstances attending the transaction put him on inquiry as to the existence and terms of such charter party, but he failed to make inquiry, and chose to act on a mere belief that the vessel would be liable for his claim." The Valencia v. Ziegler, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

(5) Where supplies and repairs are ordered in a foreign port, not by the master, but by the owner, there must be some affirmative evidence

to show that the credit of the ship was pledged as security for payment.

These propositions dispose of all the questions raised on these appeals.

## The Philip Claim.

The superintendent of the Manhattan Steamship Company, the charterer, went to libelant's shop, and said there was some work to be done on the steamer George Farwell. Libelant asked him for whom the work was to be done. He said the Manhattan Steamship Company owned the boats. The libelant, having had some previous trouble in collecting bills, replied that he did not wish to do anything for the Manhattan Steamship Company, whereupon the superintendent said, "Do it on the credit of the vessel." Here we have no question of the libelant being put on inquiry. He did, in fact, inquire, and was informed by a person who ought to have known, and who was one of the charterer's agents, that there was no charter restriction. We find no authority which would seem even to imply that the libelant, under such circumstances, was bound to make any further inquiry, or to search the documentary title to the ship. If the result is a hardship for the owners, they, rather than the libelant, should suffer, because they turned over the possession of their ship to a charterer who allowed its agents to misrepresent the situation. We are further of the opinion that libelant was entitled to rely on Schley's direction to give credit to the ship. He was not a mere subordinate employé, but the chief engineer and superintendent of the particular department concerned with work of the sort furnished. The claim of this libelant is, therefore, sustained.

## The Hoffmire Claim.

In this case the weight of evidence is to the effect that Newcomb, the general manager of the steamship company, told libelant that "he" (meaning the company) had bought the ship, and that the work was done upon an express understanding with him that "the ship was good for it." The claim of this libelant is therefore sustained.

## The Pollock Claim

The supplies in this case were furnished upon the order of the purchasing agent of the Manhattan Steamship Company, who stated that the steamship company owned the George Farwell. Nothing was said between the libelant and the purchasing agent, or any person representing the steamship company, in respect to a pledge of the vessel, and there are no circumstances in the case from which an understanding that the vessel was to be pledged for the supplies can be implied. The case is exactly as though the supplies had been ordered by the owner in person, and the presumption is that they were furnished upon the owner's credit, and not upon the credit of the vessel. They were charged to the steamer and owners. The libelant never saw the steamer, and did not know whether she was a domestic or foreign vessel. The case is merely one where the libelant, as was its usual custom, charged the supplies to the steamer and her owner. The decree in this case must be reversed.

## The Tregarthen Claim.

The repairs were made pursuant to an agreement with Newcomb, the manager of the Manhattan Steamship Company, or with the port captain. The libelants did not concern themselves to find out whether the vessel was foreign or domestic, did not know whether the Manhattan Steamship Company was a foreign or domestic corporation, and supposed that New York was the home port of the vessel, and that she was owned either by a New York corporation, or by an individual resident of New York. They knew that she was being generally overhauled. The supplies were charged to the steamer. This case, like the Pollock case, is one where the supplies were furnished without any agreement for a lien, express or implied, and upon the supposition that they were ordered by the owner in person at the home port of the vessel. The decree should be reversed.

## The Nieman Claim.

The libelant sold meats and groceries to the vessel on the order of the steward. He knew the home port of the vessel was Cleveland. He made no inquiries as to whether she was chartered, or on what terms. There is no other evidence as to this claim, which is not established by proof.

The decrees of the district court in the Pollock, Tregarthen and Nieman claims are reversed, and causes remitted to that court, with instructions to decree in accordance with this opinion. Costs to appellants. The decree in the Philip and Hoffmire claims are affirmed, with interest and costs.

SHIPMAN, Circuit Judge. I agree with the conclusions expressed by Judge LACOMBE in all the cases except in the Tregarthen claim, in regard to which I think that the facts require an affirmance of the decree of the district court. Tregarthen is a member of a firm of shipwrights, and was told, through Hoffmire, another libelant, and whose lien upon the steamship has been established, that the owners of the ship wanted work done upon her. Tregarthen's testimony is thereafter as follows:

"I then went to the steamer, and saw the captain, and said I heard the owners wished some work done on the ship. He said, 'Yes, wanted some new guards on,' and so forth, and sent me to the port captain. I saw him, and he said that the new guards were wanted around the ship. I asked about the owner. He said, 'Manhattan Steamship Company.' He said, 'Why, the ship is good enough for your bill.' That was Captain Holton, port captain, who said that. I gave an estimate, and the next day he agreed to it, and we started work. Newcomb, superintendent, or something, said we should get pay as soon as the work was done; said, 'We have brought a few other vessels here.' Contract price was $250."

Holton, the port captain, had charge of the repairs on the deck of the vessel, and to him the captain was subordinate. The captain said that the owners wanted deck repairs; sent Tregarthen to Holton for information, who said that the Manhattan Steamship Company was the owner, and "the ship is good enough for your bill"; agreed to Tregarthen's estimate; and, after an interview with Newcomb, the superintendent, who made promises in regard to the time of payment,

the work was started. It is true that Tregarthen thought that the vessel was owned by a New York corporation, of whose pecuniary character or responsibility he was ignorant, and it is evident to me from his conversation with Holton, who was in immediate charge of the repairs, and to whom he was sent by the captain for information, that the work was done upon the credit of the vessel, and that the libelants supposed that they had a' lien upon her under the New York statute. Tregarthen made all the necessary inquiries in regard to the ownership of the vessel, and was not bound to make further search for documentary title; and, in my opinion, did the work with as much reliance upon the credit of the vessel, and as adequate a right to rely upon her, as did either Philip or Hoffmire, although he did not obtain from the general manager a confirmation of Holton's declaration that the vessel was liable.