THE NEWPORT et al.

(District Court, D. Connecticut. March 30, 1901.)

No. 1,248.

**1. MARITIME LIENS—SUPPLIES AND REPAIRS FURNISHED TO OWNER—IMPLIED AGREEMENT FOR LIEN.**

Under the rule that, where repairs are ordered in a foreign port by the owner, there must be some affirmative evidence to show that the credit of the ship was pledged as security for payment, to entitle the repairer to a lien, it is not essential that such evidence should show an agreement for a lien in express words, but facts and circumstances which justify the inference that there was a common understanding that the ship would be bound establish an implied agreement for a lien, and are sufficient.

**2. SAME—KNOWN INSOLVENCY OF OWNER.**

In determining whether there was an implied agreement for a lien for repairs made or supplies furnished on the order of the owner, the known insolvency of the owner is a fact entitled to great weight.

**3. SAME—SUFFICIENCY OF EVIDENCE.**

Repairs and supplies were furnished by the several libelants for a dredge, and scows used in connection therewith. The ownership of the vessels was doubtful. They were unregistered, and bore no indicia of their home port. The parties in possession, and at whose instance the repairs were made and the supplies furnished, had been known for years to be irresponsible, and were without other credit than could be obtained on the vessels. It further appeared that libelants relied upon the credit of the boats, and that the parties with whom they contracted so understood, and both at the time and subsequently recognized their right to liens, and advised their enforcement after the vessels had been libeled by others. *Held*, that such evidence was sufficient to establish a common understanding that the credit of the vessels was pledged, and to sustain the claims of libelants to liens, although there was no agreement therefor in express words.

In Admiralty. Suits to establish maritime liens. On exceptions to report of commissioner.

Alexander & Ash, Brandegee, Noyes & Brandegee, Cowen, Wing, Putnam & Burlingham, Seymour & Knapp, Geo. Curtis Morgan, Arthur B. Calkins, James D. Dewell, Jr., H. A. Hull, and W. F. M. Rogers, for libelants.

Avery F. Cushman, for two libelants and for claimants.

TOWNSEND, District Judge. Exceptions to report of commissioner upon inquiry under rule 24 as to the amount and precedence of liens upon avails of sale. One Morris S. Brainard, a contractor carrying on business in the name of Brainard Bros., was doing dredging

work in New London Harbor under a contract with the United States government, employing in said work the dredge and scows involved herein. There is considerable uncertainty as to their ownership. Brainard was in possession as owner or charterer. It is agreed that he was not a resident of the state where the repairs were made for which the liens are claimed; that the dredge and scows were all engaged in one indivisible contract, to be performed by the fleet as a whole; that all were under the control of one captain; that there was no name of home port, or other indicia of ownership, on either the dredge or scows; and that they were without record or documentary title. It is further shown that Brainard had been irresponsible since 1892; that he had nothing on which to procure credit, except these boats; and that after they were libeled he went to the various material men and others claiming liens, and told them that the fleet had been libeled, and advised them to enforce their liens. The various libelants swore that they trusted to the credit of the dredge and scows, and, with one exception, that they supposed that the charges were made against them and the owners. The claims amounted to between fifteen and sixteen thousand dollars, and the dredge and scows were sold under order of court. The avails of the sale were between nine and ten thousand dollars. The commissioner has reported upon some 30 claims, allowing some and disallowing others.

The exceptions to the allowances of liens and contention in support of claimed liens which were disallowed are chiefly argued on behalf of one Joseph Laughlin, and of said Joseph Laughlin and Robert Rogers, trading under the name of the Automatic Supply Company, libelants of the dredge for alleged advances to Brainard and for the use of the scows, and on behalf of the owners of the tug Volunteer, libelants for towage. The libelants Laughlin and the Automatic Supply Company claim as follows:

"Joseph Laughlin was for about two years prior to their sale by the marshal the sole owner of the scows above mentioned, having purchased them of Morris Brainard, the sole surviving member of the firm of Brainard Bros., which was undoubtedly the owner at the time of the sale. As evidence of this is the testimony, uncontradicted, of Laughlin and Brainard. There is in evidence, also, a duly-acknowledged bill of sale, dated and acknowledged about two years prior to the marshal's sale. This bill of sale has not been assailed, and the only attack made upon it is an argument that, as to one of the so-called duebills (which had nothing to do with the sale of the scows), Laughlin testified falsely."

### As to these claims the commissioner finds as follows:

"The evidence in support of the claims of Joseph Laughlin and of Joseph Laughlin and Robert Rogers, trading under the name of the Automatic Supply Company, was so contradictory and improbable as not to be worthy of any credence, and the claims should be disallowed. The evidence does not show bona fide valid transfer of the scows to Laughlin, or any advancement or supplies furnished the dredge or scows, except on the evidence of Joseph Laughlin, to which the commissioner, owing to the disclosures appearing in the testimony, did not feel justified to give the least belief."

The claim of Grafton Milliken, owner of the Volunteer, was for $750 for towing, and was disallowed by the commissioner, and said disallowance is affirmed for reasons to be stated hereafter.

Thus it will be seen that all the objections to the allowance of liens come from parties claiming liens which have been found to be without any basis.

The first exception to be considered is to the allowance of lien of the Morgan Iron Works against the dredge Newport, amounting to $806.93, and against scow 9, amounting to $450.07. The evidence shows and the commissioner finds that the work was done on the order of the captain. Brainard testifies, however, that they were made under his general agreement; that he spoke to Mr. Morgan about doing all of the work when they first went to New London; and it is admitted that nothing was ever said about a lien. This claim, and in fact practically all the claims, raise the question whether a maritime lien arises in the absence of express agreement before the services are rendered that such lien shall attach. Inasmuch as it appears that the repairs were not ordered by Brainard, but by the captain of the dredge Newport, and that the bill was charged to said dredge, the report of the commissioner allowing said claims is affirmed.

The second exception is to the allowance of the claim of Thomas Drummond for $163.26. The testimony is conflicting as to whether the repairs were made on the order of the captain or of Brainard. The commissioner finds that they were made on the order of the captain. After the boat had been libeled, Brainard came to Drummond and said: "Am sorry we cannot pay your bill. You had better put your lien on with the rest." The report of the commissioner allowing this claim is affirmed.

The third exception is to the allowance of the claim of James D. Leary to the amount of $1,015. The report of the commissioner on this claim is as follows:

"In this case the libelant gave express notice that he should claim a lien, and the repairs were ordered by the owner after such notice. These repairs were considerably earlier in date than any others heretofore considered. Morris Brainard stated after they were incurred that they were a just claim against the Newport. This claim should be allowed, with interest amounting to $1,019. I find he is entitled to a lien for said amount and interest to date."

Here was an express agreement for a lien. Furthermore, upon the view taken of the question of law raised by the commissioner and to be hereafter discussed, this claim should be allowed. The evidence shows that Leary had had previous dealings with Brainard, that he knew he was irresponsible, that the repairs were furnished in New York Harbor on the credit of the vessel, and that, although he took a note, he said that he did not thereby waive his lien or take the same in payment. After the services were rendered, Brainard admitted that Leary "has a just account against the dredge Newport for $1.015."

The fourth exception, to the disallowance of the Newhall claim of lien, was not pressed, and the report thereon is affirmed.

The fifth exception is to the disallowance of the claim of lien of Grafton Milliken for $750 for towing. Irrespective of the question of law raised by the commissioner, this disallowance is justified by the evidence. No evidence was introduced by the owner of the tug in support of his claim, although he was present part of the time at the

hearing. The only testimony is that of Brainard, who says he thinks the boat was employed about five days, at $80 a day, in July, but that he cannot tell positively as to the number of days she worked. The report of the commissioner disallowing said claim is affirmed on the ground that the evidence was insufficient.

Exceptions 6, 7, 8, 10, and 11 raise the question of maritime lien. The report of the commissioner as to these claims is as follows:

"This claim and the ten others next hereinafter named I find are not entitled to participate in the avails of sale, by reason that the contracts for services therein named and charged for were made with the owners of the dredge by the contractors for the work without any express contract of lien, on the authority of The Saratoga (D. C.) 100 Fed. 480."

It is agreed that, if by the word "express" in said report is to be understood a specific oral or written agreement that if the supplies were furnished the vessel should be liable, this statement is correct, in so far as it relates to the facts found by the commissioner. The commissioner ruled that in the absence of such express agreement there was no lien by the maritime law. Counsel have exhaustively discussed the cases bearing on this question. Counsel for claimants rely on the following dictum in The Iris, 40 C. C. A. 301, 100 Fed. 104, namely: "Proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created," where the contract is made by the owner. It is not necessary in the disposition of this case to question the accuracy of this statement. The single point presented and decided in said case was that an admiralty court would enforce a statutory lien for repairs in a home port without an express agreement for a lien. It is to be noted, however, that the cases cited in support of the foregoing proposition generally differ from those here under consideration in the fact that the supplies were ordered by charterers in possession of vessels under an agreement not to incumber them with liens.

In The Roanoke, 107 Fed. 743, the court of appeals in this circuit says:

"Per Curiam. It was held in The George Farwell, 43 C. C. A. 373, 103 Fed. 882, that 'where supplies and repairs are ordered in a foreign port, not by the master, but by the owner, there must be some affirmative evidence to show that the credit of the ship was pledged as security for payment.' See, also, The Stroma, 3 C. C. A. 530, 53 Fed. 281; The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, 41 L. Ed. 710."

Here the following facts furnish such affirmative evidence: The ownership of the dredge and scows was doubtful. They were mere strays, without name or other indicia of home port. The parties in possession had been known to be irresponsible for many years, and therefore could obtain no credit, except as based on the bottom of the fleet. That they understood there was to be a lien appears from the letters, conversations, and admissions of Brainard that these material men had liens, and by his advice to them to enforce the liens. The understanding of the material men is shown by their statements that they trusted the boats, and by the absence of any evidence in their books to the contrary, except in the case of the Bridgeport Towing Line, which is not sufficiently definite to be material, and by their

bills rendered against the vessels and retained by the owners. That the affirmative evidence need not be by express words sufficiently appears from the decisions above cited. Thus, in The Stroma, supra, Judge Shipman, delivering the opinion of the court of appeals, says:

"The known general owner may, however, expressly pledge the credit of his vessel in a foreign port for supplies, and there often are circumstances and facts which show that the credit of the vessel was pledged in fact, though not in words, and that such security was within the common intent of both parties."

In The Valencia, supra, the court says:

"We mean only to decide at this time that one furnishing supplies or making repairs on the order simply of a person or corporation acquiring the control and possession of a vessel under such a charter party cannot acquire a maritime lien if the circumstances attending the transaction put him on inquiry as to the existence and terms of such charter party."

As Judge Bradford says in The Ella (D. C.) 84 Fed. 471:

"The latest utterance by the supreme court upon this subject was in The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, 325, 41 L. Ed. 710, 713, where it was said that 'in the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as made on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.' In the same case the court recognizes that a lien would exist if there were either an 'express agreement for a lien,' or 'circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred.'"

So, in The George Farwell, supra, Judge Lacombe, delivering the opinion of the court, disallows some of the claims because they were ones "where the supplies were furnished without any agreement for a lien, express or implied."

The exhaustive review by Judge Bradford, in The Ella, of the causes bearing on this question, dispenses with the necessity of further discussion. He says:

"It thus appears that 'an agreement, express or implied, for a lien'; 'circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred'; 'circumstances satisfactorily showing that a credit of the ship was within the common intention'; 'an agreement or some circumstances indicating a common intention to bind the ship'; 'a credit of the ship proved to be within the intention of both parties'; 'circumstances and facts which show that the credit of the vessel was pledged in fact, though not in words, and that such credit was within the common intent of both parties'; 'acts or circumstances from which it can be inferred that the credit of the ship was either within the contemplation of both parties, or was recognized by both'; 'circumstances of the transaction, as shown by the proof, that there was a common understanding or intention to bind the ship'; 'the mutual understanding of the parties'; 'the facts and the probabilities, without the aid of technical presumptions'; and a contract evidenced by 'the conduct of the parties,'—have severally been considered sufficient to support a lien. A common understanding for a lien is equivalent to a common intent to bind the ship, for when parties deal under such an understanding the ethics of the law will conclusively presume a common intent."

It seems to be settled that the insolvency of the owner is of great importance in showing that supplies were furnished on the credit of the vessel. In view of this fact, Judge Brown found in the Havana

(D. C.) 54 Fed. 202, that "any personal credit of the owner * * * instead of the vessel was in the highest degree improbable." In The James Guy, 1 Ben. 112, Fed. Cas. No. 7,195, affirmed in 5 Blatchf. 496, Fed. Cas. No. 7,196, 9 Wall. 758, 19 L. Ed. 710, which was a case almost exactly like this, Judge Benedict held that such facts were sufficient evidence of an agreement or understanding of a credit to the vessel, and he sustained the lien.

In view of these authorities, I think that, if it can be shown that it was the common understanding and intention of the parties that there should be a maritime lien for supplies or repairs, such lien may be sustained in the absence of an express agreement. I find, upon the practically undisputed evidence, that there was such a common understanding and intention herein, and therefore the claims of lien should be sustained. It would be most inequitable if a pretended owner, acting under a secret trust, after having secured between five and ten thousand dollars of necessary services, repairs, and supplies on a vessel, should be permitted to deprive the material men of payment by this technical claim, which is in direct conflict with his own statements and conduct at the time of procuring said services and supplies, as well as at the time when the fleet was libeled.

As to exception 9, to the disallowance of the claim of Rogers and Laughlin for $871.69 for supplies, said disallowance is affirmed for the reasons above stated by the commissioner.

The fourteenth exception is to the disallowance of the claim of Morris A. Murray for $150 for two months' services, at $75 a month. The finding of the commissioner thereon is as follows:

"The employment of Morris A. Murray as a sort of errand boy or steward of the boat, whose service was mostly performed on shore, and seemed to be that of a land assistant to the dredging crew, I do not find to be that of a seaman, or that he is entitled to a lien for his wages. That the extraordinary price that Morris Brainard agreed to pay him indicates, to my mind, some outside and personal service to Brainard."

I concur in the view that the wages were exorbitant, and that the services were not worth more than $35 per month. A careful reading of the testimony raises a doubt whether the services were not maritime in their character, within the decisions; but as the commissioner had the witnesses before him, and was cognizant of all the facts and circumstances, I think his finding should be approved.

As to the exception to the allowance of the claim of the Providence Dry Dock & Marine Railway Company: The captain then in charge and possession of said scows ordered the repairs, and the conclusion of the commissioner upon the facts found by him that the charges therefor are a lien on the scows is affirmed. A decree may be entered in accordance with this opinion.