## THE CLINTON et al.

### (Circuit Court of Appeals, Fifth Circuit. March 24, 1908.)

### No. 1,756.

#### MARITIME LIENS—REPAIRS IN FOREIGN PORT—CONTRACT WITH OWNER.

One who makes repairs on a vessel in a foreign port under a contract with the known owner, then present, is not entitled to a maritime lien therefor in the absence of a contract for a lien, express or implied, or a mutual understanding that the repairs were furnished on the credit of the vessel, and the burden of proving such contract or understanding rests upon the libelant asserting the lien.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, §§ 7–13.]

Appeal from the District Court of the United States for the Southern District of Florida.

The following is the opinion of LOCKE, District Judge, in the lower court:

This is an action in rem, by libelant, a Louisiana corporation, to enforce an alleged lien against the steamship Clinton, being at the time of attachment at Tampa, in this district, the same being her home port. The debt alleged in the libel was for $7,023.39, due for repairs and materials furnished by libelant in New Orleans, under a contract with James McKay, her owner. The libel was afterwards amended reducing the debt claimed to $2,023.39. The vessel was attached by process issued out of this court, and afterwards

released on a bond of $8,000, libelant having at first demanded one for $14,000. Respondent answering denied that the work and materials done and furnished was done upon the credit of the vessel, or that there was any understanding either express or implied that there should be a lien upon the vessel for the same. Other matters in defense were set up in the answer, but, as determining the above questions disposes of the case, they need not be considered.

Testimony was taken and submitted, from which it appears that the repairs were contracted for and authorized by the owner, James McKay, in a foreign port to be made by parties who had previously often rendered such service for said McKay. The manager of the libelant, Mr. Johnson, insists that he understood such work as he did gave him a lien upon the vessel. Was it a part of his proposal to do the required work, and did he make it a condition of the contract, and was it mutually understood and such conditions accepted by McKay? Testimony does not show such to have been the case, and in lack of such element in the contract the law presumes that the contract was with the owner, and upon his credit. A maritime lien is a powerful instrument. It enables a creditor without any notice to his debtor, and without giving him the protection of a bond for illegal proceedings, to attach and sieze a vessel, even though, as in this case, she is loaded with freight and filled with passengers and about to proceed upon a voyage. It gives him power to inflict almost irreparable injury upon the debtor; and no prudent owner would invest his creditor with such power, except as a last resort. The history of the attempt to enforce this alleged lien as shown by the pleadings and testimony in this case illustrates the possibilities arising from the holding by a creditor of such a weapon. Respondent's vessel was seized when about to go upon a voyage, and delayed by a demand for a bond nearly four times as large as warranted by law, and it cannot be rightfully claimed by libelant that no damage was caused by this abuse of the process of the court, because his credit was sufficient to enable him at length to furnish bond twice as large as could be legally required. The vessel was released. The damage and injury to respondent's business and to his credit by being delayed and compelled to give such bond cannot be estimated. A maritime lien is not only dangerous to the owner, not to be resorted to if it can be avoided, but it is a secret lien, unfair to all persons dealing with the owner, and trusting him upon the credit arising from his ownership, possession, and control of vessels, therefore the principle is well established that such liens are not favored by the courts, and are not recognized unless conclusively shown. An owner has a right to know when a party with whom he is dealing intends to claim an admiralty lien, and have an opportunity to arrange for credit, or to be able to meet it. If the owner is informed that the creditor will demand the security of a lien, he may be able to arrange elsewhere for personal credit. There is nothing to show that if McKay has been informed that libelant would claim a lien upon this vessel he could not have had the work done elsewhere upon his own credit. It is not necessary, however, for McKay to show that there was no contract for lien. It is for Johnson to show that there was one. A consultation of the authorities referred to by libelant does not seem to me to support the view that because the manager of the libelant thought he would have a lien and he would not have done the work had he not thought so.

In The Eclipse, Fed. Cas. No. 4,268, it is said the lien was enforced because it was found the supplies were furnished on the credit of the boat, regardless of any intention or knowledge of the owner. No particulars of the case are given to show how this "was found." In the case of The James Guy, Fed. Cas. No. 7,195, the intent of the owner was shown by the declaration on the note given that the amount was to be charged to the vessel. In the case of The Union Express, Fed. Cas. No. 14,364, the vessel was a domestic vessel, and in the cases of The Witch Queen, Fed. Cas. No. 17,916, The Plymouth Rock, Fed. Cas. No. 11,236, the supplies were furnished upon the orders of the masters, and the liability of the vessels for repairs or supplies furnished by order of the owners were not under consideration. The case of The Ella (D. C.) 84 Fed. 471, cited by libelant, seems to support the contention of respondent. The court says: "The maritime law does not recognize any lien on a vessel for repairs furnished in a foreign port on the

direct order of the owner in person, unless there is an agreement, express or implied, for a lien; but if there is a common understanding on the part of the repairer and the owner that the furnishing of necessary repairs is to proceed upon the basis of a lien, or of extension of credit to the ship, as well as to the owner or master, there is an implied agreement or contract for a lien, and a lien will be recognized and enforced." This "common understanding" is the element that I find to be lacking in this case. It is not established by testimony, and is positively denied by respondent. There is no implied agreement for a lien from the circumstances of the furnishing of the supplies or repairs; nor any presumption in law of such lien simply by the furnishing of supplies upon the order of the owner. On the contrary, the presumption is that credit is given to the owner, and the burden of proof is upon the libelant who claims that the circumstances were such as to prove a contract for a lien. In The Columbus, 67 Fed. 553, 14 C. C. A. 522, the court says: "The question is not whether the libelant contemplated a lien, but whether it was a mutual understanding of both parties." In The Francis (D. C.) 21 Fed. 921, it was held that in order to hold a ship, the material-man must show either an agreement or some circumstances indicating a common intention to bind the ship. In The Aeronaut (D. C.) 36 Fed. 497, it is distinctly declared that a credit of the ship must be proven to be within the intention of both parties. In The Stroma, 53 Fed. 281, 3 C. C. A. 530, the court says: "The owner may expressly pledge the vessel, but such pledging of the ship must be within the intent of both parties. In The George Dumois (D. C.) 66 Fed. 353, the court dismissed a libel because it was not satisfied that there was a mutual intent to bind the ship.

In the case of Dredge Boat No. 1 (D. C.) 135 Fed. 867, the court says: "The work was done in a foreign port, and had it been contracted for by the master, would have been a prima facie case of lien; but the libelant's difficulty is that he contracted with the owners without making any arrangement for a lien; and the fact that no lien was contemplated is shown to some extent by the two payments made by the owners as above. No lien can be sustained under the circumstance of this case. It would not matter if the libelant intended to rely upon the credit of the dredge of which the charge in their books is but slight evidence." The Samuel Marshall, 54 Fed. 396, 4 C. C. A. 385, declares the same principle. The Ella (D. C.) 84 Fed. 471, says: "The maritime law does not recognize any lien on a vessel for repairs in a foreign port on the direct order of the owner in person, unless there is an agreement, express or implied, for such lien." In The Now Then (D. C.) 50 Fed. 944, it is said by the court: "The presumption of credit to the vessel does not arise, and a lien does not exist except by the express contract of the parties." This was affirmed in 55 Fed. 523, 5 C. C. A. 206. In the case of The Valencia v. Ziegler, 165 U. S. 270, 17 Sup. Ct. 325, 41 L. Ed. 710, the Supreme Court said: "It is true the libelants delivered the coal in the belief that the vessel, whether a foreign or domestic one, would be responsible for the coal; but such belief is not sufficient in itself to give a maritime lien. If that belief was founded upon the supposition that the company owned the vessel, no lien would exist, because in the absence of an agreement, express or implied, for a lien a contract for supplies made directly with the owner in person is to be taken as made in his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived. In The Kingston (D. C.) 23 Fed. 200, it is held: "When materials are furnished and labor performed under a contract with the owner, no general maritime lien can be claimed."

In the case of The Havana (D. C.) 87 Fed. 487, very nearly parallel to this, in which the repairs exceeded largely the first estimate, and were made by the direct order, and under the supervision of the owner, the court says: "The libelants concede that to entitle them to recover the proof must show a contractual lien, not an implied lien resting on given facts as in the case of repairs on a master's order, but as one resting on a contract in the case of bottomry. * * * Of course, a mutual understanding that a lien shall exist, is a contract for a lien. Do these facts prove an understanding? The question thus presented is the only subject for consideration. The burden of proof is on the libelants; they must show the contract clearly, or fail in the

suit. Such liens are secret and not favored. I do not find anything inconsistent with the nonexistence of a lien." The libel was dismissed, and the decision affirmed upon appeal in 92 Fed. 1007, 35 C. C. A. 148. In The Jennie Middleton (D. C.) 94 Fed. 683, the court says: "The record fails to disclose any record of express contract for a lien." The libel was dismissed, with costs.. In The Regulator, Fed. Cas. No. 11,665, it was held that the presence of the owner does not imply a lien—citing The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122. In Sarchet v. The Davis, Fed. Cas. No. 12,357, it was held, that no implied lien was created when the owner was present with his vessel. In Thomas v. Osborn, 19 How. 22, 15 L. Ed. 534, it was said: "It is true this implied lien does not exist in a place where the owner is present." "It is true the libelants were unwilling to credit the owners, but it does not appear that they communicated this to the owners, or that other parties would not have furnished the articles upon the owners' credit." Libel was dismissed, with costs. In the case of The Mary Morgan (D. C.) 28 Fed. 196, Judge Butler said: "An owner who obtains supplies in a foreign port, not being master, deals presumptively on his personal credit, and no lien will be implied unless the libelant satisfies the court that there was a common understanding that the ship should be bound; in other words, unless the libelant proves an express lien. The debt was contracted by the owners. The presumption, therefore, is that credit was given to them personally. This presumption must stand, at least until answered by evidence sufficient to repel it. · I have failed to discover any such evidence in the case. There was no agreement for a lien, nor was there anything in the situation of the vessel or her owners at the time to justify the conclusion that a pledge was usually intended."

In the case of The Surprise, 129 Fed. 875, 64 C. C. A. 311, the court quoted approvingly from the case of The Iris, 100 Fed. 104, 40 C. C. A. 301, as follows: "By the maritime law, no lien for supplies or labor furnished a vessel is presumed to arise on a contract made by the owners, and proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created. Neither is it sufficient that the party who furnished the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel, or would not have furnished them except on the belief that he was acquiring a lien for them. In this respect the statute is different from what it is with reference to liens for labor and supplies furnished a vessel on the order of her master."

These few quotations from the numerous cases decided upon this particular point appear to be conclusive that the only question for consideration is whether there was a mutual understanding between the officers of the libelant company and the claimant McKay that there should be a lien upon the vessel to secure the payment for the repairs, the burden of proof being upon the libelant; and no presumption arising simply from the existence of a necessity for furnishing repairs. The testimony of the respondent is direct and positive that there was no such understanding on his part; that he had been transacting business of the same character and nature with the libelant for many years; that the accounts had always been paid; that no suggestion had ever been made to him on that occasion that the vessels were to be held under a lien. It further appears that when it was found that the repairs had exceeded by about tenfold the amount which was originally contemplated, and he was compelled to ask credit for a short time, having paid $5,000 cash on the account of but little over $7,000, he suggested, if desired, he would give a mortgage on the vessel, which suggestion was declined; but even then there was no idea or expression of the existence of a maritime lien. It is insisted that his subsequent representation in his letter wherein he states that the libelants are fully protected, as the vessel would be in New Orleans every two weeks, and they could take such steps as they desired to protect themselves, that that was an admission or recognition of the existence of a lien.

On the other hand, it is contended that the suggestion that action might be taken upon the presence of the vessel in New Orleans was rather a denial of an idea of a maritime lien which might be enforced at any time and place. This latter contention appears to me to be the most natural and reasonable,

and simply suggests the libelant's opportunity of enforcing a statutory or common-law attachment. Maritime liens only have risen through the necessities of the occasion, and are not favored unless such necessity is shown. While an owner may, it is conceded, contract for a lien upon his vessel for supplies or repairs, and such contract may be enforced, it is considered that in the absence of any direct evidence of such contract for a lien there is no presumption of the existence of such, and that the understanding to amount to such a contract must be mutual, and not depending entirely upon the idea or belief in the mind of the libelant that the supplies or repairs give a lien regardless of the intention or design of the owner. In this case I fail to find any evidence of any such mutual understanding or agreement that there should be a lien. While it cannot be contended that the giving of notes would render void a valid lien or constitute a new indebtedness, yet the acceptance of such may be taken into consideration as an important circumstance in determining whether or not a valid lien was existing at the time. In the case of The James Guy, supra, upon which the libelant largely depends, the notes taken embodied the idea of an existing lien, and therein stipulated that the amounts were to be charged to the vessel. There was nothing to that decision which conflicts, as I understand it, with the views in this case.

Failing to find that there was the existence of any such contract, either direct or implied, as would give a lien upon the vessel precludes the necessity of the consideration of the question of damages or set-off presented by the cross-bill filed herein, and the libel will be dismissed, with costs.

Harry H. Hall and F. M. Simonton, for appellant.

W. A. Carter, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and BURNS, District Judge.

PER CURIAM. As the libelant contracted with the known owner, then present, for the repairs of the steamship Clinton, and as no arrangement was made nor understanding had that the libelant should make the repairs on the credit of the ship, no maritime lien resulted. The libelant had a domestic lien under the laws of Louisiana, which was probably lost from failure to register and otherwise, and it does not seem to have been urged either in the court below or in this court.

The reasons and the authorities given by Judge Locke fully warrant the decree of dismissal, and the same is affirmed.