## GRAYS HARBOR STEVEDORE CO. v. UNITED STATES. THE LIBERA-TOR. THE WESTHAVEN. THE CAPE ROMAINE. THE CAPE HENRY.

(District Court, D. Maryland. April 5, 1924.)

### Nos. 1033, 1034, 1133, 1136, 1213.

1. **Maritime liens ⊜⟿30—Stevedoring company, failing to investigate authority of conditional purchaser of vessel, held to acquire no lien.**

   Where a stevedoring company furnishing services and supplies to a vessel belonging to the United States conditionally sold to shipping company failed to investigate the ownership of the vessel, it did not exercise the diligence to ascertain whether shipping company had authority to bind the vessel required by Act June 23, 1910, as amended by Act June 5, 1920, § 30, subsec. R (Comp. St. Ann. Supp. 1923, § 8146¼pp)), and therefore acquired no lien.

2. **Maritime liens ⊜⟿30—Degree of diligence same under general maritime law as under maritime lien acts.**

   The degree of diligence required of a person, claiming a lien for services to a vessel, to ascertain the authority of the charter or person in possession to bind the vessel, is the same under the general maritime law as under Act June 23, 1910 (Comp. St. §§ 7783–7787), and Act June 5, 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼–8146¼t).

3. **Maritime liens ⊜⟿28—No lien arises under contract made by owner of vessel without proof that minds of parties met.**

   Under the general maritime lien law, no lien for supplies or labor furnished a vessel arises under a contract made by the owner, without proof that parties intended that such lien should be created, and this understanding may be express or implied, but the undisclosed mental condition of the parties is ineffective to create a lien.

4. **Maritime liens ⊜⟿65—Under maritime lien acts, no presumption that materialman does not intend to rely on credit of vessel.**

   Under Maritime Lien Act June 23, 1910 (Comp. St. §§ 7783–7787), and Act June 5, 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼–8146¼t), there is no presumption that materialman furnishing supplies under contract with the owner to a vessel does not intend to rely on credit of vessel.

In Admiralty. Libels by the Grays Harbor Stevedore Company against the United States, as owner of the Liberator, of the Westhaven, of the Cape Romaine, and of the Cape Henry. Libels dismissed.

See, also, 286 Fed. 444.

Robert W. Williams and Joel W. Massie, both of Baltimore, Md., and Theodore B. Bruener, of Aberdeen, Wash., for libelant.

Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md.

Stuart S. Janney, of Baltimore, Md., for trustee in bankruptcy of Atlantic, Gulf & Pacific S. S. Corporation.

SOPER, District Judge. In each of these cases, the libelant brings suit against the United States, as the owner of a merchant vessel, under the Suits in Admiralty Act of March 9, 1920 (41 Stat. 525 [Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l]), claiming a maritime lien for stevedores' services and other necessaries furnished the vessel at Grays Harbor in the state of Washington. The vessels were registered in the name of the United States as owner—the Cape Henry and

Cape Romaine at Baltimore, the Liberator at San Francisco, and the West Haven at Seattle.

At the time the services were furnished there was outstanding in the case of each vessel a contract whereby the United States agreed to sell, and the Atlantic, Gulf & Pacific Steamship Corporation, a Maryland corporation, agreed to buy, the vessel at a fixed price, to be paid in installments. It was provided that, when 50 per cent. of the purchase price was paid, the United States would give the buyer a bill of sale, and the buyer would simultaneously execute a mortgage to the United States. The contract also provided that, pending the transfer of title of the vessel to the buyer, the buyer would not suffer any lien or charge having priority to the title of the seller in the vessel, but would pay and discharge all lawful claims which might have precedence over the title of the seller as a lien or charge against the vessel. It was further provided that a copy of the contract should be carried with the ship's papers. During the period in which the services were rendered by the libelant, title to each vessel remained in the United States, and as to each vessel the buyer was in default. Alfred P. Hammond was the Pacific Coast manager of the steamship corporation, with offices at San Francisco. He gave blanket instructions to the libelant to load all of the vessels at Grays Harbor at an agreed price. The steamship corporation was also represented at Grays Harbor by a port captain or traveling representative, through whom instructions from the San Francisco office were given to the libelant at Grays Harbor.

The amounts claimed as to the several vessels include the cost of stevedoring services and certain moneys advanced for the payment of bills for services rendered to the vessels by other parties. There is testimony on behalf of the libelant that the services were performed and the advances were made on the credit of the ships. Testimony is also given by the Pacific Coast manager of the steamship corporation that it was his belief that the supply men and stevedores had liens for services rendered to the vessels, but there was no evidence of any discussion between the parties as to the credit of the vessels, or of any disclosure on either side as to the intention to hold the vessels liable. The services were not rendered and the moneys were not advanced at the request of the masters of the several ships, but, on the contrary, the business arrangements were conducted by the representative of the owner on one side and the libelant on the other.

So far as the evidence discloses, the vessels were operated on the Pacific Coast and entered the port of Grays Harbor from time to time during the period between the fall of 1921 and August of 1922. During this period the libelant rendered services in accordance with its general arrangement with the Pacific Coast manager. Bills were approved by the port captain or traveling representative, and sent to the San Francisco office from time to time, and were paid, with the exception of the balance of one bill incurred in November, 1921, and the other bills for services between June and August, 1922, for which these suits are brought.

[1] It appears from the testimony of the Pacific Coast manager that the vessels were operated by the steamship corporation in the same way

as if privately owned, and that there was nothing about the operation of them to indicate that the United States, or the Shipping Board, or the Emergency Fleet Corporation had any interest in them. The manager knew, or had reason to believe, that the vessels had been purchased from the United States, and had not been paid for. He did not know the nature of the contract between the United States and the steamship corporation, but he assumed that the vessels were bought on some plan for deferred payment, without definite information as to whether they were covered by a mortgage, promissory note, or sales contract. There was no copy of the contract between the United States and the steamship corporation at the San Francisco office. He had no knowledge as to whether a copy of the contract relating to each ship was kept on board the ship, as provided in the contract. It appears that the libelant on one occasion was told by the Pacific Coast manager that the vessels were owned by the steamship corporation, but no investigation was made by the libelant to ascertain any further fact.

The Act of June 23, 1910 (36 Stat. 604 [Comp. St. §§ 7783-7787]), as amended by the Act of June 5, 1920 (41 Stat. 988 [Comp. St. Ann. Supp. 1923, §§ 8146¼-8146¼t]), provides in section 30, subsection R, as follows:

"Nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefore." Comp. St. Ann. Supp. 1923, § 8146¼pp.

In United States v. Carver, 260 U. S. 482, 489, 43 Sup. Ct. 181, 67 L. Ed. 361, this language has been interpreted to require that the materialman or furnisher of services or supplies shall not rest upon presumption, but is called upon to inquire, and if, by investigation with reasonable diligence, he can find that the vessel is under charter or contract of sale, he is chargeable with notice of its terms. Obviously, libelant failed to exercise such diligence, and therefore acquired no lien under the statutes cited. See The Princess Matoika, 298 Fed. 153, 1924 A. M. C. 303.

But the libelant nevertheless contends that the services of a stevedore are not covered by the act of 1910, or by the act of 1920, and that it acquired a lien under the general maritime law for necessary services rendered to vessels in a foreign port on the credit of the vessels. It claims that under the rule laid down in the cases of The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512, and The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, it was under no obligation to ascertain whether the steamship corporation had authority to charge the vessels, because there were no circumstances attending the transactions to put the libelant on inquiry.

As to the first contention, it may be said that it is by no means clear either that stevedore services are not within the act of 1920. Although the act of 1910 gave no lien for stevedore services (see The Muskegon [C. C. A.] 275 Fed. 348, and The Hatteras, 255 Fed. 518, 166 C. C. A. 586), it has been held that such services were covered by the act of 1920

(The Henry S. Grove [D. C.] 285 Fed. 60). That act, in section 30, subsection P (Comp. St. Ann. Supp. 1923, § 8146¼ooo), provides that any person furnishing towage or other necessaries to a vessel shall have a maritime lien, and this language was considered broad enough to include the services of a stevedore, which, like towage, relate to the carriage of goods.

[2] To support its contention that the degree of diligence to be exercised by a party claiming a lien under the general maritime law is less onerous than that prescribed by the act of 1920, the libelant cites the case of The Ville De Dibiouti, The Bourbonnais, 1924 American Maritime Cases, 299. It was there said that the act of 1920 changed the law to the extent of imposing the duty of inquiry in every case, whereas under the decisions of The Kate and The Valencia, supra, the rule was that the duty of making inquiry depended upon the facts and circumstances of the particular case. But in Piedmont Coal Company v. Seaboard Fisheries Co., 254 U. S. 1, 41 Sup. Ct. 1, 65 L. Ed. 97, and New Bedford v. Purdy, 258 U. S. 96, 42 Sup. Ct. 243, 66 L. Ed. 482, it was declared that the act of 1920 made no changes in the general principles of the existing law of maritime liens, except (1) to do away with the distinction as to the lien for supplies furnished to a vessel in a foreign port or in a home port; (2) to do away with the doctrine that when the owner of the vessel contracts in person for necessaries, or is present in the port where they are ordered, it is presumed that the materialman did not intend to rely upon the credit of the vessel; and (3) to substitute a single federal statute for the varying state statutes in regard to liens for repairs, supplies, etc.

It so happened that in The Kate and in The Valencia there were facts which in the opinion of the court put the libelant on inquiry, and it was not necessary for the court to decide whether in all cases the affirmative duty to inquire existed. As was said by Robert M. Hughes in his article on Maritime Liens in 26 Cyc. 742, 782:

"And although the Supreme Court in the two recent cases, [The Kate and The Valencia] so often cited in this connection, has carefully limited itself to the actual question before it, which involved only the powers of a charterer where the materialman had means of knowledge, it is believed that the law when necessarily presented to the court for decision will be settled against the right of a charterer to bind the vessel for supplies ordered by him, and not by the master, even when the materialman is ignorant of the existence of a charter. This for the reason that the master is the only person known to marine law as having power to create implied liens. The very fact that supplies are ordered by any one else makes a prima facie case against an intent to charge the vessel and ought to put the materialman on inquiry as to the extent of such person's power."

The conclusion is that the degree of diligence required under the general maritime law and under the acts of 1910 and 1920 is the same. [3, 4] Even if the libelant were right in its contention that its claims should be considered in the light of the general maritime law, and not of the statute, the libels must be dismissed. By the general maritime law, no lien for supplies or labor furnished a vessel is assumed to arise on a contract made by the owner, but proof is required that the minds of the parties met on a common understanding that such a lien should

be created. One of the purposes of the acts of 1910 and 1920, as already pointed out, was to do away with the doctrine that when the owner contracts for necessaries, it is presumed that the materialman does not intend to rely upon the credit of the vessel. See the Act of 1910, § 1; 36 Stat. 604; the Act of 1920, § 30, subsection P, 41 Stat. 1005. Except for that legislation, an agreement with the owner to charge the vessel, either express or implied from the circumstances, is necessary to give rise to a lien. It is not sufficient under the general maritime law that the party who furnished the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel and would not have furnished them, except on the belief that he was acquiring a lien for them, or that the owner or agent of the vessel believed that the supply man would acquire a lien by furnishing supplies. The undisclosed mental condition of the parties is ineffectual to create a lien. While an understanding between the parties may be inferred from facts as well as from express language, it must either have been expressed or inferred from the circumstances in order to bring it into operation. The Samuel Marshall, 54 Fed. 396, 4 C. C. A. 385; Lighters Nos. 27 and 28, 57 Fed. 664–666, 6 C. C. A. 493; The Electron, 74 Fed. 689, 21 C. C. A. 12; The George Farwell, 103 Fed. 882, 43 C. C. A. 373; The Iris, 100 Fed. 104, 40 C. C. A. 301; The New Brunswick, 129 Fed. 893, 64 C. C. A. 325; Reed Bros. Dredge No. 1 (D. C.) 135 Fed. 867; The Golden Rod, 151 Fed. 8, 80 C. C. A. 248; The Vigilant, 151 Fed. 747, 81 C. C. A. 371; Cuddy v. Clement, 113 Fed. 454, 51 C. C. A. 288; Id., 115 Fed. 301, 53 C. C. A. 94; The Cimbria (D. C.) 156 Fed. 378; The Clinton, 160 Fed. 421, 87 C. C. A. 373; The Keystone State, 185 Fed. 781, 107 C. C. A. 651.

There was nothing in the circumstances of these cases to disclose a maritime necessity for credit to the vessels. As already stated, the services and supplies were not ordered by the masters of the vessels, but by a representative of the owner. Bills rendered by the libelant for prior services had been paid from time to time, and the evidence does not show that any facts were brought to the attention of the libelant, or considered by it, indicating that the steamship corporation was without financial responsibility, or was unable to pay the expenses incurred in the operation of the vessels. There was no express agreement as to a lien, and there were no circumstances from which such agreement might be inferred.

The libels will be dismissed.