## THE KATE.[1]

CERTIORARI FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 106. Argued January 6, 7, 1896. — Decided November 30, 1896.

A New York corporation owned and operated steamships plying between that port and Brazil. A Pennsylvania company was in the habit of supplying these ships with coal as ordered, charging the New York company therefor upon its books, and as further security for the running indebtedness, filed specifications of lien against the vessels under a statute of New York. Subsequently the New York company began to employ in their business other steamers under time charter parties which required the charterers to provide and pay for all coals furnished them, and the Pennsylvania company supplied these ships also with coals, knowing that they were not owned by the New York company, and understanding, although not absolutely knowing, and not inquiring about it, that the charterers were required to provide and pay for all needed coals. None of such coals were supplied under orders of the master of a chartered vessel, but the bills therefor were rendered to the New York company, which, when the supplies were made owed nothing for the hire of the vessels. The coals were not required in the interest of the owners of the chartered vessels. Proceedings having been taken in admiralty to enforce liens for coal against the vessel, *Held,*

(1) That as the libellant was chargeable with knowledge of the provisions of the charter party no lien could be asserted under maritime law for the value of the coal so supplied;

---

[1] The docket title of this case is "The Berwind-White Coal Mining Company, Appellant, v. The Steamship Kate &c."

(2) Without deciding whether the statute of New York would be unconstitutional if interpreted as claimed by the libellant, it gives no lien where supplies are furnished to a foreign vessel on the order of the charterer, the furnisher knowing that the charterer does not represent the owner, but, by contract with the owner, has undertaken to furnish such supplies at his own cost.

THE case is stated in the opinion.

*Mr. George Bethune Adams* for appellant.

*Mr. J. Parker Kirlin* and *Mr. William Pierrepont Williams* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is a proceeding in admiralty for a decree condemning the steamship Kate, an English vessel, her boilers, engines, tackle, apparel and furniture, to be sold in satisfaction of the claim of the Berwind-White Coal Mining Company, the libellant herein, for the alleged value of seven hundred and sixty-six tons of coal furnished to and delivered on board of that vessel at the city of New York on the 23d day of December, 1892.

The owner, a British subject, intervened and filed an answer denying the liability of the vessel. The District Court having dismissed the libel, 56 Fed. Rep. 614, the cause was transferred by appeal to the United States Circuit Court of Appeals, in which court certain questions of law arose which were certified to this court under the sixth section of the act of March 3, 1891, c. 517, 26 Stat. 826. Upon examining the questions so certified, as well as the statement of facts that accompanied them, this court, by appropriate order, required the whole record to be sent up that the cause might be here determined, as fully as if it had been brought here for review by appeal.

The case made by the pleadings and proofs is substantially as stated by the Circuit Court of Appeals, and is as follows:

The United States and Brazil Mail Steamship Company, a New York corporation, having a place of business at the city

of New York, owned and operated vessels plying between that city and ports in Brazil. Coal for their use was obtained from the libellant, a Pennsylvania company, which was engaged in mining and selling coal and had a place of business in the city of New York. The coal was furnished upon the order of the steamship company, and, in each instance, was charged upon the libellant's account books to that company as well as to the respective vessels.

In June, 1891, the steamship company being indebted to the libellant for coal delivered in the sum of twenty-five thousand dollars, the latter for its security filed specifications of lien against the vessels under a statute of New York providing for the collection of demands against ships and vessels. Laws of New York, 1862, p. 956, c. 482. Subsequently, upon an adjustment of accounts between the parties, it was agreed that the libellant should continue to furnish coal to the vessels of the steamship company, and in its discretion and for its security to file in the proper office specifications of lien against each vessel for the coal supplied to it. All the vessels, for which the libellant had, up to that time, furnished coal, upon the order of the steamship company, were owned by that company. But shortly thereafter the steamship company began to employ in its business steamers obtained under time charter parties. Among the vessels so employed was the steamship Kate.

The charter party under which the steamship company obtained the possession and control of the Kate was executed December 15, 1892. It contained, among other conditions, the following:

"That the owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the captain, officers, engineers, firemen and crew, and shall pay for the insurance of the vessel; also for all engine room and deck stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

"*That the charterers shall provide and pay for all the coals,* port charges, pilotages, agencies, commissions *and all other charges whatsoever, except those above stated.* That the char-

terers shall accept and pay for all coal in the steamer's bunkers on delivery, and the owners shall, on the expiration of this charter party, pay for all coal left in the bunkers each, at the current market prices at the respective ports when she is delivered to them."

"That the charterers shall pay for the use of said vessel at the rate of six shillings and six pence per gross register ton per calendar month, commencing from the time the vessel (after entry at the custom-house) is placed with clean holds at charterers' disposal, and at and after the same rates for any part of a month. . . ."

"Owners to provide rope, falls, block and slings necessary for handling ordinary cargoes up to three-ton weight."

"That the captain shall prosecute his voyage with the utmost dispatch, and take every advantage of wind, by using the sails with a view to economize fuel, and shall render all possible assistance with ship's crews and boats.

"*That the captain* (although appointed by the owners) *shall be under the orders and direction of the charterers as regards employment, agency or other arrangements;* and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or otherwise complying with their orders and directions. That if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers or engineers, they shall make such complaint in writing to the agent in New York, specially appointed by owners, who shall have full power to act on their behalf, and, if necessary, dismiss any of the officers should they find the complaints made by charterers are justified and proven.

"That the charterers shall have permission to appoint a supercargo $^{and}_{or}$ purser, who shall accompany the steamer, and be furnished free of charge with first-class fare and accommodation, and see that the voyages are prosecuted with the utmost dispatch.

"That the master shall be furnished, from time to time, with all requisite instructions and sailing directions, and shall keep a full and correct log of the voyage or voyages in which

the consumption of coal shall be correctly entered, which are always to be open to inspection of the charterers or their agents."

"That the owners shall have a lien upon all cargoes and all subfreights for any amount due under this charter; and the charterers shall have a lien on the ship for all moneys paid in advance and not earned."

The owners of each chartered vessel, as the libellant knew, had an agent for the business of the vessel at New York city. The libellant knew or could easily have known what vessels belonged to the steamship company and what vessels were operated by the latter under time charters. It is true that its agents did not examine the charter parties, nor make any inquiry as to their provisions; but from what they had always heard about such instruments they believed and assumed, or took it for granted, that they contained conditions requiring the charterers, at their own expense, to provide and pay for all coals needed by the vessel. It was under these circumstances that the libellant furnished each vessel, operated by the steamship company, with coal as ordered by that company, charging the company and the vessel therefor, without making any distinction in the mode of keeping its accounts between the vessels owned by the steamship company and those operated by it under time charter parties. Specifications of lien were filed in the proper office against each vessel to which coal was delivered.

None of the coal furnished to the chartered vessels was ordered by the master of the vessel, nor were any of the bills therefor submitted to him for approval. They were submitted only to the steamship company. Nor did the agents of the chartered vessels know that coal was supplied by the libellant on the credit of the vessel, or that any specifications of lien were filed under the local statute.

The coal received by the chartered vessels was delivered at different dates, between August 17, 1892, and December 31, 1892; that received by the Kate and referred to in the libel being delivered on the 23d of December, 1892.

The steamship company was not informed until after Decem-

ber 31, 1892, of specifications of lien having been filed under the statute against the chartered vessels.

In January, 1893, the libellant having been advised by the steamship company not to remain unprotected in the future, the latter was then informed by the libellant that it had filed specifications of lien against all the vessels, including those chartered.

The coal furnished to the chartered vessels was contracted for and delivered at a time when nothing was due to the owners from the charterer, the hire of the vessels having been paid in advance.

Coal was not required in the interest of the owners of the chartered vessels at the time it was furnished; for the agent of each vessel had sufficient funds in hand, or could have obtained sufficient funds upon the credit of the vessel, to supply coal for any given voyage.

It may be assumed, for the purposes of the present case — although the evidence upon this point is not very satisfactory — that the libellant in fact relied upon the credit both of the charterer and the vessel, and believed that it acquired a lien, in each instance, by the filing of specifications under the statute of New York of 1862, which statute was subsequently amended, but not in any particular affecting the determination of this case. Its provisions, so far as it is material to refer to them, are as follows:

"§ 1. Whenever a debt, amounting to fifty dollars or upwards, as to a sea-going or ocean-bound vessel, or amounting to fifteen dollars or upwards, as to any other vessel, shall be contracted by the master, owner, charterer, builder or consignee of any ship or vessel, or the agent of either of them within this State, for either of the following purposes:

"1st. On account of work done or materials or other articles furnished in this State for or towards the building, repairing, fitting, furnishing or equipping such ship or vessel;

"2d. For such provisions and stores furnished within this State as may be fit and proper for the use of such vessel at the time when the same were furnished. . . .

". . . Such debt shall be a lien upon such vessel, her tackle,

apparel and furniture, and shall be preferred to all other liens thereon, except mariners' wages."

" 3. Such specification shall be filed in the office of the clerk of the county in which such debt shall have been contracted, except that when such debt shall have been contracted in either of the counties of New York, Kings or Queens, such specification shall be filed in the office of the clerk of the city and county of New York."

The charterers of the Kate having failed to pay for the coal delivered to it, the present libel was filed.

The decree of the District Court dismissing the libel proceeded upon two principal grounds: 1. That as the libellant did not deal with the owner of the vessel, or with its master or other officer, but only with the charterer, which had no authority to charge the vessel with liability for coal, and as the libellant knew, or must under the circumstances be assumed to have known, that the charterer himself had undertaken, with the owners, to furnish such coal as the vessel required, there was no lien under the maritime law — citing. *The Stroma*, 11 U. S. App. 673; *The Samuel Marshall*, 49 Fed. Rep. 754, affirmed in 6 U. S. App. 383; *The Turgot*, 11 Prob. Div. 21; *The Aeronaut*, 36 Fed. Rep. 497. 2. That the statute of New York, properly construed, presupposes for its application a relation of express or implied authority, and if that authority does not exist, and that fact is known to the material man, or if he is legally chargeable with knowledge of it, no lien arises, by virtue of the statute, when the transaction is with a charterer, any more than when the dealing is with any other agent or consignee known to be unauthorized and forbidden to contract the debt; that if the statute be considered as imposing a lien upon the vessel, notwithstanding the libellant knew, or should be held to have known, that the charterer was required by the charter party under which he controlled the vessel to provide himself the coal needed by it, then such statute is unconstitutional and void in its application to commercial and maritime transactions " as an unreasonable and unjust interference with commerce, and as imposing an unjust burden on ships as the instruments of

commerce, beyond the power of state authority." 56 Fed. Rep. 614.

1. Touching the first of these grounds, the contention of the libellant is, that the stipulation in the charter party binding the charterer to pay for all coal was only an executory agreement, for the breach of which the owner could hold the charterer personally responsible; that the law will not permit the owner and the charterer, by agreement, express or implied, to withdraw the vessel from the operation of a lien in favor of those who furnish supplies to it in a foreign port; that even actual knowledge, upon the part of the person furnishing supplies, that the charterer had agreed himself to furnish, at his own expense, the coal needed by the vessel, was wholly immaterial under the New York statute.

We are of opinion that, as the libellant knew, or, under the circumstances, is to be charged with knowledge, that the charter party under which the Kate was operated obliged the charterer to provide and pay for all the coal needed by that vessel, no lien can be asserted under the maritime law for the value of coal supplied under the order of the charterer, even if it be assumed that the libellant in fact furnished the coal upon the credit both of the charterer and of the vessel. As the charterer had agreed to provide and pay for all coal used by the vessel, he had no authority to bind the vessel for supplies furnished to it. His want of authority to charge the vessel for such an expense, was known or could have been known to the libellant by the exercise of due diligence on its part. Under the circumstances, the libellant was not entitled to deliver the coal on the credit of the vessel, and its attempt to hold the vessel liable is in bad faith to the owner. The law cannot approve or encourage such an attempt to wrong the owners of the vessel. Neither reason nor public policy forbade the owner and the charterer from making the arrangement evidenced by the charter party of December 15, 1892. The master of a ship is regarded as " the confidential servant or agent of the owners, and they are bound to the performance of all lawful contracts made by him, relative to the usual employment of the ship, and the repairs and other necessaries

furnished for her use. This rule is established as well upon the implied assent of the owners, as with a view to the convenience of the commercial world." *The Aurora*, 1 Wheat. 95, 101. "The vessel must get on," and "the necessities of commerce require, that when remote from the owner, he [the master] should be able to subject his owner's property to that liability, without which, it is reasonable to suppose, he will not be able to pursue his owner's interests." *The St. Iago de Cuba*, 9 Wheat. 409, 416; *The J. E. Rumbell*, 148 U. S. 1. When, therefore, supplies are furnished to a vessel in a foreign port, upon the order of the master, nothing else appearing, the presumption is that they were furnished on the credit of the vessel and of the owners, and an implied lien is given. But no such necessity can be suggested, and no such reasons urged, in support of an implied lien for supplies furnished to a charterer, when the libellant at the time knew, or by such diligence as good faith required could have ascertained, that the party upon whose order they were furnished was without authority from the owner to obtain supplies on the credit of the vessel, but had undertaken, as between itself and the owner, to provide and pay for all supplies required by the vessel.

There are many cases in which the recognition or rejection of liens under the maritime law have depended upon the diligence of parties in ascertaining the limitations imposed by the owners of vessels upon the authority of masters. These cases proceed upon the ground that good faith must have been exercised by the party seeking to enforce a lien upon the vessel. As they throw light upon the present inquiry, it is proper to refer to some of them.

In *Thomas* v. *Osborn*, 19 How. 22, 31, 32, the court said that all the commentators agree "that if one lend money to a master, knowing he has not need to borrow, he does not act in good faith, and the loan does not oblige the owner. *Valin*, Article 19; *Émérigon, Contrats à la Grosse,* Chap. 4, Sec. 8, and the older commentators cited by him. *Boulay-Paty, Cours de Droit Com. Mar.* Tit. 1, Sec. 2; Tit. 4, Sec. 14; and see the authorities cited by him in Note 1, page 153." "If," the court

said, "the master has funds of his own which he ought to apply to purchase the supplies which he is bound by the contract of hiring to furnish himself, and if he has funds of the owners which he ought to apply to pay for the repairs, then no case of actual necessity to have a credit exists. And if the lender knows these facts, or has the means, by the use of due diligence, to ascertain them, then no case of apparent necessity exists to have a credit and the act of the master in procuring a credit does not bind the interest of the general owners in the vessel." In the same case it was said : " We are of opinion Loring & Co. [merchants who had given a credit to Leach, to whom had been committed the entire possession, command and navigation of the vessel] had no right to lend Leach money or furnish him with supplies on the credit of the ship, and cannot be taken to have done so. Our opinion is that inasmuch as the freight money earned by the vessel was sufficient to pay for all the needful repairs and supplies, and might have been commanded for that use, if they had not been wrongfully diverted, no case of actual necessity to encumber the vessel existed ; and as Loring & Co. not only knew this, but aided Leach to divert the freight money to other objects, they obtained no lien on the vessel for their advances."

In *The Grapeshot*, 9 Wall. 129, 136, the court, observing that courts of admiralty do not scrutinize narrowly the account against the ship, said : " They will reject, undoubtedly, all unwarranted charges ; but upon proof that the furnishing [of supplies and materials] was in good faith, on the order of the master, and really necessary, or honestly and reasonably believed by the furnisher to be necessary for the ship while lying in port, or to fit her for an intended voyage, the lien will be supported ; unless it is made to appear affirmatively that the credit to the ship was unnecessary, either by reason of the master having funds in his possession applicable to the expenses incurred, or credit of his own or of his owners, upon which funds could be raised by the use of reasonable diligence ; and that the material man knew, or could, by proper inquiry, have readily informed himself of the facts."

So, in *The Lulu*, 10 Wall. 192, 201–204, the court said : "Good

faith is undoubtedly required of a party seeking to enforce a lien against a vessel for such a claim [for advances to the master, or for repairs or supplies furnished at his request], but the fact that the master had funds which he ought to have applied to that object is no evidence to establish the charge of bad faith in such a case unless it appears that the libellant knew that fact, or that such facts and circumstances were known to him as were sufficient to put him upon inquiry within the principles of law already explained. Express knowledge of the fact that the master had sufficient funds for the purpose is not necessary to maintain the charge of bad faith, as it is well-settled law that a party to a transaction, where his rights are liable to be injuriously affected by notice, cannot wilfully shut his eyes to the means of knowledge which he knows are at hand, and thereby escape the consequences which would flow from the notice if it had been actually received; or, in other words, the general rule is that knowledge of such facts and circumstances as are sufficient to put a party upon inquiry, and to show that if he had exercised due diligence he would have ascertained the truth of the case, is equivalent to actual notice of the matter in respect to which the inquiry ought to have been made." Again: "Viewed in any light, it is clear that necessity for credit must be presumed where it appears that the repairs and supplies were ordered by the master, and that they were necessary for the ship when lying in port or to fit her for an intended voyage, unless it is shown that the master had funds, or that the owners had sufficient credit, and that the repairer, furnisher or lender knew those facts or one of them, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry, and to show that if they had used due diligence they would have ascertained that the master was not authorized to obtain any such relief on the credit of the vessel."

In *The Emily Souder*, 17 Wall. 666, 671, the court said that the presumption of law, in the absence of fraud or collusion, where advances are made to a captain in a foreign port, upon his request, to pay for necessary repairs or supplies to enable his vessel to prosecute her voyage, or to pay harbor dues, or

for pilotage, towage and like services rendered to the vessel, that they are made upon the credit of the vessel as well as upon that of her owners, "can be repelled only by clear and satisfactory proof that the master was in possession of funds applicable to the expenses, or of a credit of his own or of the owners of his vessel, upon which funds could be raised by the exercise of reasonable diligence, and that the possession of such funds or credit was known to the party making the advances, or could readily have been ascertained by proper inquiry."

In *The Sarah Starr*, 1 Sprague, 453, 455, the court said that "in giving credit to the vessel and owners, the material-man should act in good faith, and he would not be deemed to act in good faith, if he knew that the master had funds wherewith to pay for the supplies, or, if facts were known to him, which would create suspicion, and put him upon inquiry, when such inquiry would have led to the knowledge that the master had funds, and had no right, therefore, to obtain supplies on credit. That is, if the material man had knowledge that the master was acting in bad faith towards his employers, or knew of circumstances which ought to admonish him to make inquiry that would have led to such knowledge, then he would be affected with bad faith, as colluding with the master, and aiding him in violating his duty to his owner. But if the material man had no reason to suppose that the master was violating his duty in obtaining a credit, he might, upon request of the master, trust to the vessel and owners, and a lien would thereby be created."

The principle would seem to be firmly established that when it is sought to create a lien upon a vessel for supplies furnished upon the order of the master, the libel will be dismissed if it satisfactorily appears that the libellant knew, or ought reasonably to be charged with knowledge, that there was no necessity for obtaining the supplies, or, if they were ordered on the credit of the vessel, that the master had, at the time, in his hands, funds which his duty required that he should apply in the purchase of needed supplies. Courts of admiralty will not recognize and enforce a lien upon a vessel when the transaction upon which the claim rests originated in the fraud of the

master upon the owner, or in some breach of the master's duty to the owner, of which the libellant had knowledge, or in respect of which he closed his eyes, without inquiry as to the facts.

If no lien exists under the maritime law, when supplies are furnished to a vessel upon the order of the master, under circumstances charging the party furnishing them with knowledge that the master cannot rightfully, as against the owner, pledge the credit of the vessel for such supplies, much less is one recognized under that law where the supplies are furnished, not upon the order of the master, but upon that of the charterer who did not represent the owner in the business of the vessel, but who, as the claimant knew, or by reasonable diligence could have ascertained, had agreed himself to provide and pay for such supplies, and could not, therefore, rightfully pledge the credit of the vessel for them.

2. But a lien is claimed in virtue of the statute of New York giving a lien upon the vessel for a debt contracted by the master, owner, charterer, builder or consignee, on account of work done or materials or other articles furnished in the State " for or towards the building, repairing, fitting, furnishing or equipping " the vessel, or for such provisions and stores furnished within the State " as may be fit and proper for the use of such vessel at the time when the same were furnished." Literally or narrowly construed, the statute takes no account of any arrangement or agreement between the charterer and the owner whereby the authority of the former to pledge the credit of the vessel is restricted, although the conditions under which the charterer obtained possession and control of the vessel were known or could reasonably have become known to the person with whom the charterer contracted.

We are of opinion that the statute need not and should not be so construed. It ought not to be so interpreted as to put it in the power of the charterer and the person with whom he contracts to combine for the purpose of accomplishing a result inconsistent with the known agreement between the charterer and the owner.

If the libellant in this case had furnished the coal upon the

order of the master, and without knowledge or notice that the vessel was operated under a charter party, or if coal had been furnished upon the order of the charterer as well as upon the credit of the vessel, under circumstances which did not charge libellant with knowledge of the terms of the charter party, but charged it only with knowledge of the fact that the vessel was being operated under a charter party, a different question would be presented.

It is unnecessary for the decision of this case to consider whether the statute of New York, if interpreted as claimed by the libellant, would be repugnant to the commerce clause of the Constitution. We decide only that libellant has no lien on the vessel under the maritime law, and that the statute of New York, reasonably construed, does not assume to give a lien where supplies are furnished to a foreign vessel upon the order of the charterer, with knowledge upon the part of the person or corporation furnishing them, that the charterer does not represent the owners, but by contract with them has undertaken to furnish such supplies at his own cost.

The decree of the District Court dismissing the libel is, therefore,

*Affirmed.*