## THE VILLE DE DJIBOUTI.

### COPPOLINO et al. v. COMPAGNIE HAVRAISE PENINSULAIRE DE NAVIGATION A VAPEUR et al.

(District Court, E. D. Pennsylvania. February 27, 1924.)

Nos. 147, 189.

1. **Maritime liens** ⊂⊃4—**Charter party held to withhold from charterer authority to lien vessel for supplies.**

   A charter party containing a provision that charterer shall pay for stated materials and supplies amounts to a withholding from charterer of authority to lien the vessel for such supplies.

2. **Maritime liens** ⊂⊃28—**Parties furnishing stevedoring services and materials to vessel under charter held to have no lien.**

   Where neither the party furnishing, at charterer's request, stevedoring services, nor the party furnishing labor and materials, knew any facts showing that the vessel was under charter, and the charter party required charterer to pay for such services, but neither party made any inquiry to ascertain the facts, *held* that, under Act June 23, 1910, §§ 1, 2, 3 (Comp. St. §§ 7783–7785), neither party secures a lien on the vessels.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Maritime liens ⊕═30—Duty of making inquiry.**
> Act June 23, 1910 (Comp. St. §§ 7783–7787), imposes upon one furnishing supplies to a vessel the positive duty of making inquiry as to the authority of the person ordering the supplies to bind the vessel.

In Admiralty. Libel by James Trimble against the steamship Ville de Djibouti. Libel dismissed.

Libel by Matthew Coppolino and Frank M. Coppolino, trading as Matthew Coppolino & Son, against the Compagnie Havraise Peninsulaire de Navigation a Vapeur, a corporation of the republic of France, and the Algerian American Line, Inc., a corporation of the state of New York. Decree for respondent.

Joseph P. Nolan, of New York City, and Joseph L. McAleer, of Philadelphia, Pa., for Compagnie Havraise Peninsulaire de Navigation a Vapeur.

Willard M. Harris and Joseph D. Morelli, both of Philadelphia, Pa., for libelants Coppolino & Son.

McKEEHAN, District Judge. These two cases were tried together and can be conveniently disposed of in one adjudication. The Coppolino claim is in personam to recover $2,586.16 with interest, being a balance due for stevedoring services rendered to the steamship Bourbonnais in January, 1923, at the port of Philadelphia. The Trimble claim is a proceeding in rem against the steamship Ville de Djibouti to recover $1,543, with interest, for labor and materials for fitting the holds of that ship for a cargo of grain in January, 1923, at the port of Philadelphia; this amount including a charge of $125 for interruption and detention of the libelant's work.

Both vessels were owned by the Compagnie Havraise Peninsulaire de Navigation, a French corporation, and both were vessels of French registry. At the time the supplies and services in question were rendered, both vessels were under time charters to the Algerian American Line, Inc., a corporation of the state of New York; the charters providing, inter alia, that the charterers would—

"furnish and pay for all the fuel (coal, briquets, oil, or essences), port expenses, pilotage consulate fees, canal duties (if any there are), agency expenses, commissions, expenses of loading and of discharging of cargoes, and all other charges of whatever kind, with the exception of those borne by the navigation company (the owner) by virtue of article 2."

The stevedoring services of Coppolino were ordered directly by a Mr. Haynor, president of the Algerian American Line, Inc., although the work was done under the supervision of the Hudson Shipping Company, the Philadelphia agent of the Algerian American Line. The services performed by Trimble were under a contract awarded to him directly by the Hudson Shipping Company, as agent for the Algerian American Line. About a year before the services were rendered the Algerian American Line had arranged with the Hudson Shipping Company to handle its business at Philadelphia on a commission basis. Apparently the Hudson Shipping Company, although knowing that the ships in question were of foreign registry, assumed

that the Algerian American Line was agent of the owner and not a charterer, and, without making specific inquiry, proceeded throughout in the belief that it was the owner's subagent in Philadelphia, under appointment from the owner's agent. Neither Coppolino nor Trimble made any inquiry either from the Hudson Company or the Algerian American Line as to the right of either of them to bind the ships with liens for supplies.

[1] It will be noted that the charters in question say nothing expressly on the subject of liens for supplies, but contain the provision above quoted that the charterer would pay for the materials and services therein mentioned. Whether such a provision amounts to a withholding from the charterer of authority to lien the vessel for supplies has been settled, I think, by the Supreme Court in The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512. The charter party in that case was very like the ones here involved. It provided, inter alia:

"That the owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the captain, officers, engineers, firemen, and crew, and shall pay for the insurance of the vessel, also for all engine room and deck stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service. That the charterers shall provide and pay for all the coals, port charges, pilotages, agencies, commissions, and all other charges whatsoever, except those above stated."

In holding that one who supplied coal to the ship on the order of the charterer acquired no lien, Mr. Justice Harlan said:

"As the charterer had agreed to provide and pay for all coal used by the vessel he had no authority to bind the vessel for supplies furnished to it."

[2] Coming to the next question, sections 1, 2, and 3 of the Act of June 23, 1910 (Comp. St. §§ 7783–7785), provide that any person furnishing repairs, supplies, or other necessaries to a vessel upon the order of the owner of such vessel, or of a person by him authorized, shall have a maritime lien on the vessel; that certain persons shall be presumed to have such authority from the owner, namely, the managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted, this description to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel, with the qualification that:

"Nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

The scope and effect of this act has been described by Mr. Justice Brandeis in Piedmont Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 41 Sup. Ct. 1, 65 L. Ed. 97, as being:

"First, to do away with the artificial distinction by which a maritime lien was given for supplies furnished to a vessel in a port of a foreign country or state, but denied where the supplies were furnished in the home port or state. The General Smith, 4 Wheat. 438. Second, to do away with the doctrine that, when the owner of a vessel contracts in person for necessaries or is present in the port when they are ordered, it is presumed that the ma-

terialman did not intend to rely upon the credit of the vessel, and that hence, no lien arises. The St. Jago de Cuba, 9 Wheat. 409. Third, to substitute a single federal statute for the state statutes in so far as they confer liens for repairs, supplies, and other necessaries. Peyroux v. Howard, 7 Pet. 324."

One further change appears to have been made, however. In U. S. v. Carver (The Clio) 260 U. S. 482, 43 Sup. Ct. 181, 67 L. Ed. 361, the Supreme Court, speaking by Mr. Justice Holmes, held that sections 1, 2 and 3 of the act of 1910 do not permit the furnisher to rely on the presumptions of authority specified by the act—

"until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms, he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both."

[3] The requirement of due diligence on the part of one furnishing supplies to a vessel to ascertain the limitations imposed by the owner upon the authority of the master or charterer has long been an established principle of admiralty law. Mr. Justice Harlan reviewed several of the more important cases in The Kate, supra. Prior to the act of 1910, however, the rule seems to have been that whether a duty of making inquiry and investigation rested upon the furnisher in any particular case was to be determined from the facts and circumstances of that case. Under the decision in the Clio Case it would seem that the act of 1910 changed the law to the extent of imposing a duty of inquiry in every case, though I take it that, if the furnisher can show that a reasonably diligent inquiry would not have revealed the lack of authority, this will excuse a failure to make inquiry. The Anna E. Morse (C. C. A.) 286 Fed. 794; The South Coast, 251 U. S. 519, 40 Sup. Ct. 233, 64 L. Ed. 386.

Neither Coppolino nor Trimble knew any fact tending to show that the Algerian American Line was a charterer, and not the owner's agent; but neither made any inquiry to ascertain what the fact might be. Whether, had they done so, they would have ascertained the facts, it is impossible to say. The Algerian American Line knew that it was a charterer, and it may be presumed would have stated that fact to either of the libelants, had inquiry been made. Of course, merely to have learned that a charter party existed would not have shown the libelants that they would have no liens, since the act expressly provides that an agent appointed by a charterer, and a fortiori a charterer himself is presumed to have the owner's authority to impose liens for supplies. The investigation would have had to extend to ascertaining that under the charter party the charterer expressly agreed to pay for services and materials of the kind here involved. An inquiry addressed to the Hudson Shipping Company would probably have been answered by an assurance that that company was agent for the owner, as Mr. Hudson quite evidently believed this, though a specific inquiry on the subject might have caused him in turn to make inquiry of his principal, the Algerian American Line, and ascertain the facts. Furthermore, the probabilities are that inquiries directed to the captains of the vessels would have disclosed the facts.

Under the rules laid down by the Supreme Court in The Kate and Clio Cases, supra, I think it is this court's duty to enter judgment for the respondent in the Coppolino Case and dismiss the libel in the Trimble Case.

Decrees will be entered accordingly.