## PALMER & PARKER CO. v. UNITED STATES.

(District Court, D. Massachusetts. January 16, 1926.)

No. 1973.

1. **Shipping ⊕⇒58(2)—Evidence held to make prima facie case for subcharterer for delay.**

In libel under Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼ *l*) for damage to cargo, evidence *held* to make prima facie case for subcharterer suing for delay.

2. **Shipping ⊕⇒138—That voyage was grossly mismanaged held not to imply liability by vessel or owner under Harter Act.**

That voyage was grossly mismanaged, causing damage to cargo, *held* not necessarily to imply liability by vessel or owner under Harter Act (Comp. St. §§ 8029–8035), if vessel was seaworthy at commencement of voyage, or if due diligence had been made to make her so.

3. **Shipping ⊕⇒137—Unseaworthiness determined as of date of vessel's sailing.**

Vessel's unseaworthiness, within Harter Act (Comp. St. §§ 8029–8035), is to be determined as of date when it finishes loading and sails on voyage.

4. **Shipping ⊕⇒132(5)—Evidence held to show that vessel was unseaworthy when it commenced voyage.**

Evidence *held* to show that vessel was unseaworthy, because of failure to dry-dock and clean bottom of barnacles when it commenced voyage, resulting in delays, damaging cargo.

5. **Shipping ⊕⇒137—Defenses based on Harter Act were not available, where due diligence was not exercised to make vessel seaworthy.**

Defenses based on Harter Act (Comp. St. §§ 8029–8035) were not available, where due diligence was not exercised by charter owner to make vessel seaworthy, though failure was due to financial straits.

6. **Admiralty ⊕⇒27—United States is not liable in personam under Suits in Admiralty Act, if there was no liability in rem against vessel.**

United States is not liable in personam under Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼ *l*), if there was no liability in rem against vessel.

7. **Shipping ⊕⇒51—Maritime Lien Act held not applicable to damages to cargo from delay.**

Maritime Lien Act (Comp. St. § 7783 et seq.) applies only to persons furnishing repairs, supplies, or other necessaries, and not to libel by subcharterer for damages to cargo resulting from delay due to unseaworthiness.

8. **Shipping ⊕⇒58(2)—Evidence held to show subcharterer did not know vessel belonged to United States Shipping Board.**

Evidence *held* to show that subcharterer did not know that vessel belonged to United States Shipping Board, and was not lacking in due diligence in failing to ascertain such fact.

9. **Evidence ⊕⇒48—General knowledge that practice of Shipping Board in letting vessels to persons financially irresponsible occasions loss to mercantile and shipping concerns.**

It is general knowledge that practice of United States Shipping Board in letting its vessels to persons financially irresponsible occasions much loss to mercantile and shipping concerns dealing with such vessels in good faith.

10. **Shipping ⊕⇒125—Delays due to unseaworthiness held not "deviation," making vessel absolutely liable for cargo.**

Delays and retrogressions, due to unseaworthiness of vessel, caused by barnacles from bottom, *held* not "deviation," abrogating contract of carriage, and rendering it absolutely liable for cargo.

**11. Shipping ⬤⟹56—United States Shipping Board held liable to subcharterer for damages to cargo from unseaworthiness of vessel.**

Under Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*), United States Shipping Board was liable to subcharterer for damages caused by unseaworthiness, where subcharterer had no knowledge that vessel belonged to Shipping Board, notwithstanding provisions of original charter forbidding charterer from subjecting vessel to liens.

**12. Shipping ⬤⟹56—Vessel held not liable to subcharterer for delays caused by charterer.**

United States Shipping Board vessel *held* not liable to subcharterer for delays caused by charterer.

In Admiralty. Suit by the Palmer & Parker Company against the United States. Decree for libelant.

Gaston, Snow, Saltonstall & Hunt, Russell, Moore & Russell, John W. Lowrance, and Gibbs, Guptill & Lowrance, all of Boston, Mass., for libelant.

Charles P. Curtis, Jr., and Laurence Curtis, 2d, Asst. U. S. Attys., both of Boston, Mass., for the United States.

MORTON, District Judge. This is a libel under the Suits in Admiralty Act (Act March 9, 1920 [Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*]) to recover damages to a cargo of mahogany logs shipped by the libelant on the steamship Mt. Shasta, owned by the United States Shipping Board. It was heard on oral and written evidence. The facts are as follows:

Under date of May 19, 1920, the Shipping Board chartered the Mt. Shasta to the Mt. Shasta Steamship Company, of which Victor S. Fox & Co. were managers. It was a charter sale agreement in the form commonly used by the Shipping Board, amounting to a demise of the vessel for about 13 months, with an option to purchase. Its provisions pertinent to the questions in controversy are in substance that the charterer is not authorized to subject the vessel to liens, and will discharge any liens which may attach to her while in the charterer's control. The charterer never made any payment of hire under this charter party, except the first one on May 30th, and from June 30, 1920, was in continuous default in increasing amounts.

[1] Under date of July 14, 1920, Fox & Co., as agents for the charter owner, subchartered the Mt. Shasta to the libelant to carry a cargo of mahogany logs from the west coast of Africa—the "Gold Coast" so called—to Boston. The steamer had just discharged at Lisbon a cargo of coal which she had brought from Norfolk, and she appears to have been at or near Gibraltar when this charter was concluded. She was ordered by cable to proceed to the African coast to load. She was delayed at Gibraltar about seven days, waiting for her agents to remit money to pay for her bunker coal; and she finally sailed from that port on July 23, 1920. She arrived at Axim, Africa, on August 8th, having had trouble both with her machinery (the main air pump broke and the steering gear got out of order) and with her fire room crew on the way. She remained on that coast, loading cargo at Axim and Seccondi, until September 19th, when she sailed for Boston. She touched at Freetown and Dakar, where she was delayed about two weeks by the failure of her agents to remit money to pay for bunker coal. While she was lying at Dakar, receivers were appointed for Fox & Co. She left Dakar on October 16th, and proceeded to Cape St. Vincent, Cape de Verde Islands. She was forced to stop at sea on the way to have barnacles scraped off the suction line, and she again had trouble with her steering gear, although it was fair weather. She arrived at St. Vincent on October 20th. While there it was necessary to remove barnacles from the main strainer, because they were so thick as to impede the flow of water. She again was delayed several days by the failure of the agents to remit for bunker coal, and finally sailed for Boston October 29th.

On November 1st she was forced by engine trouble, in connection with the condition of her bottom, to turn back to St. Vincent, where she arrived for the second time on November 4th. At this port a survey was held and a certificate of seaworthiness was refused, principally because of the foulness of the vessel's bottom. There were prolonged communications by cable with the receivers of Fox & Co., which detained the vessel at St. Vincent for about 40 days. She left on December 14th for Dakar, where she arrived for the second time on December 18th. She waited there 9 days for the arrival of a marine engineer employed by the Shipping Board. She was then dry-docked and scraped. At this time her bottom was covered with a growth of barnacles, mussels, etc., about two inches thick. Her master, who was inexperienced in those waters, testified that he had never seen anything like it. It made it impossible for the vessel to maintain reasonable speed and rendered her unseaworthy. This work was completed on January 3d. She was held there 21 days more, waiting for

funds to pay for the cleaning, repairs, and bunker coal, and finally sailed for Boston on January 24th. Up to this time she had encountered no heavy weather. She arrived at Bermuda on February 10th, and after bunkering sailed February 14th, reaching Boston, as above stated, on February 19th.

Her master, Kuipers, testified that under ordinary circumstances she ought to make the run from Axim to Boston in about 30 days. The mahogany logs, which constituted the cargo, were injured by the delay, and the market on them also declined. The libelant makes a prima facie case for damage.

[2] That the voyage was grossly mismanaged is obvious from the mere recital of the facts. But this does not necessarily imply liability on the part of either the vessel or her owners, because the Harter Act (Comp. St. §§ 8029–8035) relieves them from responsibility for faults of management and navigation, if the vessel was in fact seaworthy at the commencement of the voyage, or if due diligence had been used to make her so. These provisions were in substance incorporated into the charter party and bill of lading. The libelant contends that the Mt. Shasta was not seaworthy at the commencement of the voyage, and that there was such "deviation"—using the word in its technical sense—as amounted to an abandonment of the voyage, and abrogated all rights of the vessel and her owners under the charter party and bills of lading.

[3, 4] As to unseaworthiness: Several grounds of unseaworthiness have been urged. That principally relied on is the foulness of the vessel's bottom. The date as of which the question is to be determined is September 19, 1920, when she had finished loading and sailed from the African coast, where she loaded, for Boston. The Newport (C. C. A.) 7 F.(2d) 452, 454. She had last been dry-docked, and presumably cleaned, in November, 1919; thereafter she seems to have made two voyages to Northern Europe and the voyage to Lisbon above referred to. She was not cleaned or painted with anti-fouling paint before proceeding to the African coast. There is an ambiguous statement in the deposition of her master, Capt. Kuipers, which may mean that she was in need of cleaning before she sailed on the Lisbon voyage. When asked what her condition was at the time when he joined her at Newport News in May, 1920, he said: "She needed some cleaning up, but she was seaworthy when we left Baltimore." Freeman testifies that there is no worse place for fouling than Baltimore or Newport News. It is clear that by No-

vember 4th (when she was at St. Vincent) her bottom was so foul that a certificate of seaworthiness was rightly refused on that account. This was only a month and a half after she had begun her homeward voyage.

Experts called by the respective parties have testified, to some extent conflictingly, as to whether it was prudent to send the vessel from Gibraltar to the African coast, expecting her to lie there 30 days, more or less, for loading, without first having her cleaned. The weight of their testimony is, in my opinion, that she should have been cleaned and painted. There seems to be no doubt that growths accumulate much faster on vessels' bottoms in tropical waters than in colder seas, and more rapidly when lying still than when proceeding, nor that, once a growth gets well started, it increases with considerable rapidity, especially in warm water. The owners of the Mt. Shasta were bound to know this, and to know the general character and requirements of the voyage for which they chartered, and to prepare the vessel accordingly. The proper protection of her bottom against fouling was one of these necessary preparations. There was no substantial delay in loading on the African coast—nothing beyond what should reasonably have been contemplated. Even before serious delays had occurred, the barnacles had become so bad as to interfere with the circulation through the strainer. The evidence as a whole shows pretty conclusively, I think, that the vessel ought to have been dry-docked and cleaned, and protected by anti-fouling paint before she proceeded to the African coast, and for lack of those precautions was unseaworthy at the commencement of the homeward voyage; and I so find. If that had been done, I see no reason to believe that the voyage would not have been carried through successfully. The retrogressions and delays which ensued are traceable to this omission and were without legal excuse.

[5] As due diligence was not exercised by the charter owner to make the vessel seaworthy, the defenses based upon the Harter Act are not available. Compagnie Maritime Francaise v. Meyer, 248 F. 881, 160 C. C. A. 639. The charter owner was evidently in such desperate financial straits that it was unable to meet the necessary expense; but this is not a legal excuse. It follows that, if the vessel has been owned by Fox & Co. (or the Mt. Shasta Steamship Company), she would have been liable for this cargo damage. The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772; The New York (D. C.) 93 F. 495.

[6, 7] The final question is whether the pro-

vision in the original charter from the Shipping Board to the Mt. Shasta Steamship Company, forbidding the charterer from subjecting the vessel to any liens, prevents recovery. It is well settled that the United States is not liable in personam under the act in question, if there was no liability in rem against the vessel. The Maritime Lien Act (36 Stat. 604; Comp. Stats. § 7783 et seq.) relates only to "persons furnishing repairs, supplies, or other necessaries," etc. (section 1), and does not affect this question, which goes back to The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512, and similar cases. See The Corsica, 253 F. 689, 165 C. C. A. 283. Those decisions all rest upon the fact that the person claiming the lien knew, or by reasonable diligence could have ascertained, that the person attempting to subject the vessel to a lien had no authority to do so.

[8] In this case the government contends that the libelant had knowledge that the Mt. Shasta was a Shipping Board vessel. The only direct testimony in support of this contention is that of Shack, the broker through whom the charter was negotiated. He testifies that he mentioned the fact to Frank Sawyer, Gordon Parker, and Harry A. Cobb, who appear to have been active managers of the libelant. His statement is not refreshed by any writing, and rests only upon his recollection of an interview which occurred some three years before he testified, on a point which he did not at that time regard as of importance. In the charter party Fox & Co. sign as "Agents," for whom is not stated, presumably for the Mt. Shasta Steamship Company. These was evidently a close identity of interest between Fox & Co. and the steamship company. Sawyer, Parker, and Cobb all testify in explicit denial that any such statement was made by Shack, and assert that they were told that Fox & Co. were the owners. Ralph Sawyer, the libelant's representative on the African coast, says that the captain of the Mt. Shasta told him that she was owned by Fox & Co. and said nothing about the Mt. Shasta Steamship Company or the Shipping Board. While it is true that Sawyer, Parker, and Cobb are interested witnesses, the testimony of Shack does not seem to me sufficiently convincing to warrant accepting it in the face of their denials. There is no denial of Ralph Sawyer's testimony, and there are things in Shack's testimony which indicate that he himself regarded Fox & Co. as virtually the owners of the vessel, and he may have so stated. The absence of any reference to Shipping Board ownership in the correspondence, until after the homeward voyage had started and difficulties had begun, is perhaps of some significance. It seems to me probable that the Mt. Shasta was represented to Palmer & Parker Company, as they say she was, as a vessel owned by Fox & Co. Under such circumstances it would be going too far to say that the libelants were lacking in diligence for not making further investigation as to her ownership. I find that the libelant did not know that the Mt. Shasta was under charter from the Shipping Board, and was not lacking in due diligence in failing to ascertain that fact.

[9] It is unnecessary to decide whether the conduct of the Shipping Board in permitting the steamer to remain in the hands of persons whom it knew to be financially irresponsible, and to be operating her, was such as to prevent the respondent from insisting on this term of the original charter party. It is a matter of general knowledge that the practice of the Shipping Board in letting its vessels to persons financially irresponsible occasioned much loss to mercantile and shipping concerns, who dealt with such vessels in entire good faith.

[10] As to deviation: The libelant contends that the delays and retrogressions due to the unseaworthy condition of the Mt. Shasta amounted to deviation, which abrogated the charter party and bills of lading, and rendered her absolutely liable for the cargo. It has, however, been held by very high authority that deviation caused by breach of warranty of seaworthiness is excusable, and does not displace the contract of carriage. Kish v. Taylor, [1912] A. C. 604. The consequences of deviation are so extreme that courts are reluctant to find it. See Judge Hough's discussion of it in The Citta di Messina (D. C.) 169 F. 472; Scrutton on Charter Parties (10th Ed.) p. 281. While this is a rather stronger case for the libelant than Kish v. Taylor, I think it is covered by the principle of that decision. I hold that deviation is not made out.

[11, 12] It follows that there should be a decree for the libelant, and the case should stand referred to an assessor to state the damages, including in his damages for delay such as arose from the failure of the vessel to complete the homeward voyage within 35 days after beginning it on September 19, 1920. For delay caused by the charterer, of course, the vessel is not liable.

So ordered.