## THE J. W. HENNESSY.

### DALZELL TOWING CO., Inc., v. J. W. HENNESSY, Inc. (two cases).

### Nos. 139, 140.

Circuit Court of Appeals, Second Circuit.
March 21, 1932.

Alexander, Ash & Jones, of New York City (Edward Ash and Lawson R. Jones, both of New York City, of counsel), for appellant.

Emery & Pyne, of New York City (Warner Pyne and Vincent A. Catoggio, Jr., both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

These are appeals from two libels brought by the Dalzell Company against a dredge and some barges belonging to J. W. Hennessy, Inc., for towage services. This floating equipment had been chartered by the owner, J. W. Hennessy, Inc., to the Charles Contracting Company by a demise charter. By the terms of the charter, the charterer had the exclusive use, control, possession, and operation of the equipment and agreed "at its own expense" to "operate, man, furnish all the fuel, supplies, labor, and all costs necessary to operate the same." There was no clause in the charter that the charterer had

no right or authority to pledge the credit of the vessels or to impose any liens upon them.

The treasurer of the towing company was introduced to the president of the Charles Contracting Company by the Brooklyn National Bank. Mr. Dalzell, the treasurer of the towing company, inquired of the bank as to the credit of the charterer, and was informed that it was first class. While Dalzell disclaimed knowing anything about the ownership of the equipment, he conceded that he made no inquiry. The towage services were performed, and the towing company sent repeated bills to the Charles Contracting Company for its services at the agreed rate, which were not paid. There was posted on the dredge, in the pilot house and engine room, a sign stating that J. W. Hennessy, Inc., was the owner of the dredge and would not be responsible for "the payment of material, labor or other expenses of any nature whatsoever, unless authorized by an official order signed by the secretary-treasurer of this corporation." The dredge was also enrolled in the name of J. W. Hennessy, Inc.

The towage was from Ft. Pond Bay to Cold Spring Harbor, Long Island. It was performed by a tug of the Newtown Creek Towing Company which Dalzell procured and paid for doing the job. Dalzell testified that he did not know that J. W. Hennessy, Inc., had anything to do with the dredge or barges until about sixty days after the towage services had been performed. The towage was ordered by the Charles Contracting Company, the charterer of the dredge and barges, and not by the master of any of them.

After the charterer had failed to pay for the towage services for some eight months, in spite of repeated demands, the towing company filed two libels, one against the dredge and the second against the two barges belonging to J. W. Hennessy, Inc. The latter interposed an answer alleging that the services were not furnished upon the credit of the vessels but solely for the account of the charterer, who had no right to pledge the credit of the vessels, and that the libelant at the time it rendered the services to the vessel knew or could, by the exercise of reasonable diligence, have known the terms of the charter party.

The District Judge found that the libelant company made no inquiry as to who was the owner of the dredge and equipment, but presumed when it was making the contract for towage that Charles Contracting Company was the owner because Mr. Charles, who made the arrangement, referred to the dredge and equipment as "his." The District Judge also found that libelant did not know until within forty-five to sixty days from the completion of the towage service that some one other than the Charles Contracting Company was the owner of the dredge and equipment. He dismissed the libels upon the ground that by the exercise of reasonable diligence the libelant could have ascertained that the vessels were under charter party and could have learned the terms of that agreement.

The lien asserted is based on the Merchant Marine Act of 1920 (§ 30).

Subsection P provides that: "Any person furnishing * * * towage, * * * to any vessel, * * * upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." (46 USCA § 971)

Subsection Q provides that: "The following persons shall be presumed to have authority from the owner to procure * * * towage, * * * for the vessel: The managing owner, * * * master, or any person to whom the management of the vessel at the port of supply is intrusted. * * *" (46 USCA § 972)

Subsection R provides that: "The officers and agents of a vessel specified in subsection Q, shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." 46 USCA § 973.

The J. W. Hennessy, Inc., contends that, as the charter of its floating equipment provided that the charterer was obliged at its own expense to operate the vessels and to pay all expenses, it had no authority to pledge the credit of the vessels or to impose any liens thereon, and that the libelant knew of the charter and was chargeable with notice of its terms. The libelant argues that it had no such notice.

We can hardly agree that the proof did not indicate that the libelant was aware that the charterers were not owners of the vessels,

although the trial judge found that libelant's treasurer, Dalzell, "did not know until from 45 to 60 days after the towage service that some one other than the Charles Contracting Co., Inc., was the owner of the dredge." Dalzell admitted that the telephone number of J. W. Hennessy, Inc., was given to him at the time of the negotiations for the towing contract, and Charles, the president of the charterer, testified that he informed Dalzell during these negotiations that the dredge was owned by J. W. Hennessy, Inc., and was held on a bare boat charter and that he, on that occasion, gave Dalzell the telephone number of the office of J. W. Hennessy, Inc. The trial judge did not refer to this testimony in his opinion or suggest that it was unworthy of credit. In fact he found that the telephone number of the owner of the vessels was given to Dalzell by Charles. In these circumstances, we think it must be said that the libelant received notice that the vessels were owned by J. W. Hennessy, Inc., and that they were under charter to the Charles Contracting Company. This being so, libelant was charged with notice of whatever the charter contained by reason of the provisions of section 30, subsection R of the Merchant Marine Act (46 USCA § 973).

The question therefore arises( whether, because of the terms of the charter party, "or for any other reason," the charterer ordering the towage was "without authority to bind the vessel therefor." Subsection R.

Under the charter party in this case the owner had parted with the possession and control of the vessels and the charterer was a person to whom their management was intrusted. Because of the nature of the hiring, the charterer became the owner pro hac vice. Leary v. United States, 14 Wall. 607, 20 L. Ed. 756; Baumwoll Manufacture, etc., v. Furness, [1893] A. C. 8. Such a charterer, under section 30, subsection Q of the Merchant Marine Act (46 USCA § 972), is "presumed to have authority from the owner to procure * * * towage." Does the clause in the charter party providing that the charterer shall pay all expenses indicate that "the person ordering * * * supplies, or other necessaries was without authority to bind the vessel therefor?" Subsection R, supra. If so, the lien presumed by subsections P and Q to be conferred is negatived by the terms of the charter party. In The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, though a demise charter not only required the charterer to pay all expenses, but also to save the owner harmless from liens, the Supreme Court sustained a maritime lien for supplies ordered by the master, who was the charterer's agent, even where the person furnishing the supplies not only was informed that the vessel was under charter, but was warned by the owner that he must not furnish the supplies on the credit of the vessel. Justice Holmes said: " * * * The authority of the owner to prohibit or to speak was displaced, so far as the charterer went, by that conferred upon the charterers, who became owners pro hac vice, and therefore, unless the charter excluded the master's power, the owner could not forbid its use. * * * The statute had given a lien for supplies in a domestic port and therefore had made that one of these ordinary liens. Therefore the charterer was assumed to have power to authorize the master to impose a lien in a domestic port, and if the assumption expressed in words was not equivalent to a grant of power, at least it cannot be taken to have excluded it. There was nothing from which the furnisher could have ascertained that the master did not have power to bind the ship."

In the case at bar the charterer contracted for the towage through its president, Mr. Charles, instead of ordering it through the master. Here, as in The South Coast, the charter party, while providing that the charterer should pay all expenses, did not exclude the power of the charterer to bind the vessel. We can see no difference between necessaries ordered by the president of a corporate charterer and by a master who is the charterer's agent. Each may be regarded as a "person to whom the management of the vessel at the port of supply is intrusted." Subsection Q.

The decision in United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, where a charterer agreed to pay all expenses incident to the use and operation of certain vessels, does not negative a maritime lien in the present case. There the charter also provided that the charterer should "not suffer nor permit to be continued any lien * * * which might have priority over the title and interest of the owner." In other words, the charterer did not merely promise to pay all expenses, but also agreed to suffer no lien to be imposed. It was this express negation of the right to impose a lien that distinguished the decision from the South Coast, where the charterer only agreed to save the owner harmless from liens.

In conformity with the decision in The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, are The Augusta W. Snow, 46 F.

80

(2d) 992 (C. C. A. 1), The Portland, 273 F. 401 (C. C. A. 9), and The Golden Gate, 52 F.(2d) 397 (C. C. A. 9).

In Curacao Trading Co. v. Bjorge, 263 F. 693, and Pensacola S. Co. v. U. S. Shipping Board E. F. Corp., 277 F. 889, the Circuit Court of Appeals of the Fifth Circuit appears to have reached a contrary conclusion. The decision in The Capitaine Faure (D. C.) 5 F.(2d) 1008, affirmed by this court, 5 F. (2d) 1009, is not in point, for there the services (stevedoring) were ordered by one neither authorized by the owner nor intrusted with the management of the vessel. He was a man only engaged in securing cargo for the vessel. The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512, and The Valencia, 165 U. S. 264, 17 S. Ct. 323, 41 L. Ed. 710, related to supplies furnished upon the order of a charterer prior to the passage of the Merchant Marine Act. We think that act as construed in The South Coast precluded the application of these decisions to the case at bar and subjected the claimant's vessels to a lien for towage because the charter party did not exclude the charterer's power. In the absence of any clause doing this, the Dalzell Company was given a presumptive lien for towage. It did not under section 30, subsection P, of the Merchant Marine Act (46 USCA § 971), have to prove that credit was given to the vessel. Therefore a lien attached.

It made no difference that libelant had the credit of the charterer that ordered the towage. The lien did not affect the "right to proceed in personam" or vice versa. Section 30, subsection S (3) Merchant Marine Act, 46 USCA § 974 (3). Piedmont Coal Co. v. Seaboard Fisheries Co., 254 U. S. at page 10, 41 S. Ct. 1, 65 L. Ed. 97; El Amigo, 285 F. 868 (C. C. A. 5); The Hattie Thomas, 262 F. 943 (C. C. A. 2); The Golden Gate, 52 F.(2d) 397, at page 400 (C. C. A. 9th). Therefore failure to proceed in rem for some eight months, and the attempt to collect the towage bill from the charterer, did not, in our opinion, amount to a waiver of the maritime lien. El Amigo, 285 F. 868 (C. C. A. 5th); The Hattie Thomas, 262 F. 943 (C. C. A. 2d); The Golden Gate (C. C. A.) 52 F.(2d) 397, at page 400. The burden of proving a waiver was upon the appellee. The Yankee, 233 F. 919, at page 926 (C. C. A. 3d); The El Amigo (C. C. A.) 285 F. 868.

The decrees appealed from are reversed, and interlocutory decrees are directed for libelant.