### CLARENCE P. HOWLAND CO., Inc., v. COMPAGNIE HAVRAISE PENINSULAIRE DE NAVIGATION A VAPEUR et al., and three other actions.

District Court, S. D. New York.
Aug. 19, 1926.

Mengel & Conroy, of New York City (Carl K. Mengel, of New York City, Advocate), for libelants.

Joseph P. Nolan, of New York City, for respondent.

KNOX, District Judge.

William H. Rynders has filed a libel against Compagnie Havraise Peninsulaire de Navigation a Vapeur and Algerian American Line, Inc., for services rendered as watchman on the steamers Ville de Djibouti, Malgache, and Bourbonnais. The amount of the claim is $1,533. The Algerian American Line, Inc., is out of business and bankrupt, and libelant asks that the other respondent be held liable upon the ground that it and Algerian American Line, Inc., entered into an agreement on February 4, 1922, under which they were to operate a line of steamers between Mediterranean, North African, and United States ports under the name of Algerian American Line, Inc., and to divide the profits and share the losses. Among the steamers so operated were the above-named vessels.

Howland Towing & Transportation Company has filed two libels, one against the Ville de Djibouti, and another against the above-named respondents in personam. Clarence P. Howland Company, Inc., has filed a libel in personam against respondents for supplies furnished the aforesaid vessels or some of them. The rem action is founded on a towage service rendered the Ville de Djibouti in the sum of $731.25, and the others are for towage and dunnaging of other vessels operated by respondents. The amount claimed on the latter libels aggregates $3,171.16. For the reasons heretofore stated, the claims asserted in the libels are not pressed against the Algerian American Line, Inc. The other respondent does not deny the rendition of the towage and dunnage services. It does, however, deny its liability. The same is true of the Rynders' claim.

The facts seem to be these: In the early part of February, 1922, a man named Starita, who afterwards became the principal stockholder of Algerian American Line, Inc., went to France and carried on negotiations with A. Grossos, the managing director of Compagnie Havraise Peninsulaire de Navigation a Vapeur, with respect to the establishment of a steamship service between the ports previously mentioned. Due to agreements and understandings theretofore had with the French and Fabre Lines of steamers, Compagnie Havraise did not wish openly to appear to be interested in the creation and operation of the new service. But it was quite desirous of entering the business if its connection therewith could be kept secret. Believing that an American organization, to be formed by Starita, or at his instance, could serve the purpose Havraise wished to accomplish, Compagnie Havraise authorized, and had executed, an agreement dated February 4, 1922. It provided that Compagnie Havraise should charter steamers to Algerian American Line, Inc., then being organized, at rates, terms, and conditions named in the charters. The results of the trips of each steamer were to be divided in halves between the owner and charterer, the latter company taking charge of the accounting of each vessel. The steamers were to be consigned to Algerian American Line at New York, and in other ports to agents designated by E. Grossos Sons, acting for account of the owners and of the American corporation. Various other provisions, now not material, were included in the agreement.

By the time the Starita returned to New York, the Algerian American Line, Inc., had been incorporated, and it executed the agreement that had been negotiated and returned it to France.

Strangely enough, the charters, that seem to have been contemplated by the contract, were not offered in evidence by either party. Nevertheless, there is slight doubt that charters of the vessels actually existed. That the hire was exceptionally small seems also to have been the fact. In the absence of the charters, the court has no means of ascertaining if they did, or did not, authorize the charterer to bind the ship for necessary expenses and supplies.

There exists then this situation: The Compagnie Havraise and Algerian American Line, Inc., entered into an agreement of dormant partnership with respect to the operating profits and losses of the vessels that should be put into service. Contracts of this nature seem to be lawful under the French law, and I have no hesitation in saying that the agreement now before the court is to be regarded as a French contract, and to be construed in conformity with the law of that republic.

Testimony was taken at the trial bearing on the French law; and the parties, by stipulation, have admitted into the case an opinion upon the same subject written by Leopold Dor, editor and director of Droit Maritime Compaie. He and Mr. Mancini, the expert called by the French company, agree that, ordinarily, a dormant or secret partner-

ship, such as was here made, is one which exists only so far as the relationship between the partners is concerned, and has no existence as to third parties who may contract with one of the partners. Customarily, the partner who contracts with a third party binds only himself, and the third party has no recourse against the dormant partner if his interest in the matter later becomes known. But, according to Mr. Dor, whose testimony I shall accept, there are exceptions to this rule. One of them is that when a particular partner acts as agent for his copartners, the latter are jointly and severally liable for debts contracted by the former, who also incurs a like liability.

As hereinbefore stated, the original agreement provided that the steamers should be consigned at New York to the Algerian American Line, acting both for its own account, and for the account of the shipowners. It would appear, from the accountings had between the parties to the agreements, that each class of services rendered by the present libelants was for the account of both partners, and each of them is liable therefor.

So far as the making of inquiry as to the responsibility of the shipowners for services rendered to the vessels by the present libelants is concerned, the following is to be said:

Clarence P. Howland, president of the Howland Towing & Transportation Company, Inc., testified that within from two to four weeks after his companies started to serve the vessels, he had an interview with both Mr. Starita and Mr. Raynor, of the Algerian American Line, and was told that his money was perfectly safe, as the American company represented a good house. So far as appears, he was not shown any charters of the vessels. In this connection, it must be borne in mind that there is no evidence that such agreements, if they actually existed, placed any limitation upon the power of the Algerian American Line, Inc., to bind its principal or the ships. Howland, therefore, had knowledge that the American company was the agent for the French company, and he proceeded to permit the companies controlled by him to furnish services and supplies to the ships of Compagnie Havraise.

As for Rynders, it may be said that he made no effort to ascertain the owner of the vessels, and made no inquiry as to their agents. He did not know, and never heard of, the owners. On the contrary, he says that he relied solely on the credit of the Algerian American Line, Inc. This fact, it seems to me, is of no particular significance. The authorized contracts of an agent upon behalf of an undisclosed principal are, as I understand Mr. Dor's statement of the French law as applied to the present facts, binding upon the principal. Furthermore, had an inquiry been made, it would have resulted in the knowledge that in handling these ships, the Algerian American Line was the agent of the vessels, even though it was also a partner of the French company.

The libelants may have decrees.