## C. F. STARITA CO., Inc., v. COMPAGNIE HAVRAISE PENINSULAIRE DE NAVIGATION A VAPEUR et al.

### No. 346.

Circuit Court of Appeals, Second Circuit.

July 14, 1931.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Edwin S. Murphy, of New York City, of counsel), for appellant C. F. Starita Co.

Joseph P. Nolan, of New York City (Roscoe H. Hupper and William J. Dean, both of New York City, of counsel), for appellee

Compagnie Havraise Peninsulaire De Navigation A Vapeur.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

### AUGUSTUS N. HAND, Circuit Judge.

The libel here was in personam, and was filed by C. F. Starita Company, Inc., a New York corporation, for recovery of the agreed value of stevedoring services rendered to four vessels alleged to have been operated in the New York-Mediterranean trade under an agreement between the respondent Compagnie Havraise Peninsulaire De Navigation A Vapeur, a French corporation, which will hereafter be called Havraise, and Algerian American Line, Inc., a New York corporation, which will hereafter be called Algerian. The libel alleged that by the agreement these corporations were to divide the profits and to assume the losses equally. No process was served upon Algerian.

The agreement between Havraise and Algerian was dated February 4, 1922, and was executed by E. Grosos & Fils, the authorized agents of the former, and Haynor, the president of the latter. It provided that the chartering of the vessels should be made in the form of time charters through E. Grosos & Fils, at the prices and under the terms of the charter party attached thereto. It also provided that it was intended that the "result of the voyages of each of the steamers" should "be equally divided between the owner of the vessel and the Algerian American Line at New York," and that the latter should "be entrusted with the keeping of the general accounts of the operation of each vessel." It also provided that the vessels should be consigned at New York to Algerian, and at the other ports to the agents designated by E. Grosos & Fils "acting for the account of the ship owners and of * * * Algerian." It further provided that the stevedoring should be reserved to the agents to whom the vessels are consigned, and that it should in no case be higher than the usual rates at each of the different ports, and that the rate of freight should be arranged by E. Grosos & Fils on the most favorable terms for Algerian, who were to be general agents of Algerian.

The form of time charter annexed to the foregoing agreement contained the following clauses:

"2. The Shipowners shall furnish and shall pay for all the provisions and all the wages of the Master, officers and crew; they shall also pay for the insurance of the vessel against all marine risks. * * *

"3. The Charterers shall supply and pay for all the fuel (coal, briquettes, oils or gasolene), the port charges, pilotage, consular fees, canal dues (if any), agency charges, commissions, expenses for loading and unloading cargoes, and all other charges whatever they may be, with the exception of those borne by the shipowners in accordance with Article 2."

After the making of the agreement we have mentioned, Havraise chartered to Algerian the four vessels, the stevedoring expenses of which are involved in this case, under charters containing the above clauses.

Carl Starita owned most or all of the stock of Algerian, and was the president of libelant, C. F. Starita Company, Inc., a stevedoring company, the stock of which, except for one share which he held, belonged to his family and friends. He negotiated with E. Grosos & Fils the agreement with Algerian relating to the shipping enterprise, which E. Grosos & Fils executed on behalf of Havraise. On February 14, 1922, Starita executed, on behalf of Starita Company, a contract with Algerian, whereby Starita was to load and discharge ships consigned to it arriving at the port of New York, at a schedule of rates set forth in the contract. This instrument was signed by Starita, as president of the Starita Company, and bore the seal of that company. It was also executed on behalf of Algerian by its president and secretary, but it did not bear the corporate seal of the latter.

The voyages resulted in a financial loss, and Starita & Co. brought this suit against Havraise and Algerian to recover $24,857.94, unpaid stevedoring charges, claiming that the contract for stevedoring, though made by Algerian, was really made by it on behalf of Havraise and itself as coadventurers and in furtherance of the joint enterprise.

Judge Coleman dismissed the libel on the ground that, in view of the provisions of the charter parties that the charterers should pay the "expenses for loading and unloading cargoes," the Algerian was without power to bind Havraise by the stevedoring contract between Starita Company and Algerian, and that the limitations of the authority of Algerian were known to Starita Company because of the knowledge of its president, Carl Starita.

It is said, in answer to this, that the incorporation of Algerian and its entry into the adventure was for the purpose of enabling Havraise to conceal its own identity from other steamship companies with which it had agreed not to engage in trade between New York and French and Italian Mediterranean ports. In other words, it is argued that, in making the contract with Starita Company, Algerian was acting for Havraise as well as itself. It is likewise said that this interpretation of the relations of the parties is confirmed by the fact that the accounts rendered by Algerian to Havraise in the form prescribed by the latter contain the charter hire of the vessels, coal bills, stevedoring charges, and other expenses payable by Algerian. But we cannot see that the District Judge was wrong in his finding that the Algerian had no power to bind Havraise to pay stevedoring charges. Indeed, we are satisfied that the evidence required the conclusion that he reached.

It may be that Havraise wished to keep its name out of trade in the Mediterranean and that this motive was one of the reasons for having the business conducted by Algerian. Starita, who was interested in the enterprise and negotiated the contract, doubtless expected to get the stevedoring for Starita Company, and was in a position to do this. He also hoped to profit through his ownership of the stock of Algerian. Neither party wished "to put all his eggs in one basket." Accordingly Algerian was organized and utilized so that the business would be conducted in corporate form and the liability of both the Starita interests and Havraise would be limited. The record indicates that Havraise never contracted to pay stevedoring charges or authorized such a contract on behalf of itself and Algerian. Not only did Algerian agree in each charter to pay the hire and to pay for the fuel, port charges, pilotages, consular fees, agency charges, commissions, "expenses for loading and unloading cargoes, and all other charges whatever they may be, with the exception of those borne by the shipowners in accordance with Article 2" of the charter, but in one of Algerian's earliest communications with E. Grosos & Fils, in February 1922 (Exhibit 16–b), it said: "Telegraph particulars of payment hire money shall we remit by bank draft on Paris Havre. * * * "

E. Grosos, acting for Havraise, replied on February 24, 1922:

"We think that you will also cover us for the amounts mentioned in our letter of the 11th and 17th instant, viz:

Francs 96,800—Hire Price
" 92,250—for bunker coal
" 9,315—for ballast."

In a letter dated March 29, 1922 (Exhibit 17), Algerian asked Grosos to pay agency charges in North Africa and French Mediterranean ports and debit Algerian, saying: "It is naturally understood we will immediately reimburse you." Exhibit 16–N.

Again, on October 21, 1922, Grosos wrote Algerian inclosing bill for 83,200 francs for two months' hire of the Malgache and debit notes for coal. When the expenses incurred were wages of crew and other items payable by Havraise, Grosos recognized them in their letters as separate obligations of Havraise Exhibit 16–W.

On November 7, 1922, when a contract extending the agreement of February, 1922, for three years had been executed by Algerian and was objected to by Havraise because Algerian still owed it large sums of money, Starita wrote a letter to Havraise on behalf of Algerian in which he said: "I take a formal engagement in the name of my Company" to the immediate settlement by Algerian of all amounts owing to Havraise. Exhibit O. Starita also cabled Grosos (Exhibit 21): "We can arrange liquidate our indebtedness to you complete several days. Also have balance sufficient to continue operations without credit providing you will renew the contract for 3 years. * * * "

The correspondence repeatedly discloses expenses of the enterprise which admittedly Algerian was bound to pay.

On September 22, 1922 (Exhibit M), Algerian wrote to Grosos thus: "In order to keep our good standing with merchants and brokers we are obliged to pay bills when presented. This also applies to the agents here and abroad, and this accounts for our tardiness in settling the charter hires. * * * We ask that you please be a little more lenient with regard to the settlement of charter hires. Although we appreciate the amount of indebtedness is rather large, we feel with your further cooperation, we will be able to liquidate a major portion of our indebtedness shortly. Your interest in the development of the line we * * * appreciate, has been increasing, and we feel that after you fully consider the matter that you will supplement

your past cooperation with further assistance, as we are involved in the profits and losses of the operations."

The last clause of this communication was not an assertion by Algerian that Havraise was responsible as a joint adventurer for "losses of the operations." Such an interpretation would be quite inconsistent with the separate obligation of Algerian to pay the hire and to meet the bills for coal, port charges, stevedoring, and the expenses of the enterprise other than provisions, wages of the master and crew, and insurance of the vessels. The record indicates that the charter hire was very low, and that Havraise expected to get compensation for the use of its vessels through its half interest in the profits of the enterprise. Under such an arrangement, all the expenses of the enterprise would have to be taken into consideration in order to determine the profits which Havraise and Algerian were to share. Consequently the inclusion of these expenses in statements of account was not in contradiction of the clause of the charter that Algerian must pay stevedoring charges, and indeed was the only party bound to pay any of the expenses except for provisions, wages, and insurance of the vessels.

▮ Whether or not Havraise and Algerian are to be regarded as in some respects joint adventurers with the liability of partners for obligations which arose out of the enterprise and the incidence of which is not provided for in the charters, we think it reasonably clear that the charges for stevedoring, which were to be paid by Algerian only and were covered by a separate contract with Starita Company, were not joint obligations. In form, the contract with Starita Company was individual, and the form was in fulfillment of the requirements of the charters that were by reference incorporated in the agreement between Havraise and Algerian. Nor was there any ostensible joint obligation, for Starita, who was the negotiator of the agreement and knew all the facts, was president of Starita Company and himself executed the stevedoring contract with Algerian on behalf of Starita Company. His company was bound by the real relations of the parties, and those relations involved no liability on the part of Havraise.

▮▮ The obligations of a partnership depend on principles of agency, and, "if one partner only is dealt with and the circumstances are such as to show that he was acting and was dealt with on his own account, i. e. as a principal and not as agent of the firm, he alone is responsible." Lindley on Partnership (2d Am. Ed.) vol. 1, p. 430.

In Wilson v. Whitehead, 10 M. & W. 503, A, B, and C agreed that they should bring out and be jointly interested in a periodical publication. A was to be the publisher and to make and receive general payments, B to be the editor, and C the printer; and, after payment of all expenses, they were to share the profits in the work annually. C was to furnish the paper and charge it to the account at cost prices. No profits were ever made, nor any accounts settled. The plaintiff furnished paper to A, for the purpose of being used by him in printing the periodical. A court, consisting of Abinger, C. B., and Parke, Gurney, and Rolfe, BB., held that B and C were not jointly liable with A for the price of the paper, because the other defendants did not authorize A to purchase it on their account. Kilshaw v. Jukes, 3 B. & S. 847; Willis v. Hill, 19 N. C. (2 Dev. & B.) 231, 31 Am. Dec. 412; Barton v. Hanson, 2 Taunt. 49; Smith v. Hoffman, Fed. Cas. No. 13,061; Barwick v. Alderman, 46 Fla. 433, 35 So. 13; Peterson v. Roach, 32 Ohio St. 374, 30 Am. Rep. 607; Stringer v. Stevenson (C. C. A.) 240 F. 892, at page 896; Southern Surety Co. v. Plott (C. C. A.) 28 F.(2d) 698, at page 700.

The decision of Judge Knox in Clarence P. Howland Co., Inc., v. Compagnie Havraise and Algerian American Line, 51 F.(2d) 519, 1926 A. M. C. 1366, that Havraise was liable under the contract with Algerian for supplies ordered by the latter is not in point, for the form of charter containing the limitation of powers of Algerian to bind Havraise was not before him.

In Williams v. Gillies, 75 N. Y. 197, D, G, and R entered into a parol agreement to purchase certain premises on joint account as a speculation, each to contribute a specified proportion of the purchase money; D to take the title and give back his bond and mortgage for so much of the purchase money as was not paid down; the profits to be paid pro rata. The purchase was made in pursuance of the agreement. In an action to foreclose the mortgage, a judgment for deficiency was rendered against G. This was held error on appeal because the facts did not justify a finding that the name of D was to be regarded as the agreed name of the firm for the purpose of executing the bond, or that it represented any one but D himself. It was also held that payments on the bond by G did not

change its character from that of an individual to a joint obligation.

In National Bank of Salem v. Thomas, 47 N. Y. 15, it was held that money loaned upon the promissory note and individual credit of one member of a partnership is not a partnership obligation. Allen, J., writing for the court, said: "But the difficulty with the plaintiff's case is, that the contract was not that of the firm, but of individual members of the firm. The money was loaned by the plaintiff on the individual credit of Hoag and Batty, and the fact that it was applied to the payment of partnership debts, does not constitute the lender a creditor of the firm. (Jaques v. Marquand, 6 Cow. [N. Y.] 497; Emily v. Lye, 15 East, 7.)"

It is generally true that sealed instruments, bills of exchange, and promissory notes entered into by an agent of a partnership in his own name are not obligations of the firm (Lindley, supra, vol. 1, p. 433; Restatement of the Law of Agency, American Law Institute, Tentative Draft No. 4, §§ 380, 381). But each of the New York cases we have cited contained sufficient proof that the obligation was not intended to be joint to meet the presumption that an agreement to share profits and losses ordinarily results in such an obligation.

The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, is relied on by the libelant. There a bare boat charter provided that the charterer should pay all charges and save the owner harmless from all liens or expenses. Both this decision and that in The Penza (C. C. A.) 9 F.(2d) 527, where there was a time charter, arose out of proceedings in rem for supplies ordered by the master on the credit of the vessel. It was held that nothing short of a prohibition in the charter would prevent the master of a vessel from exercising his traditional authority to subject the vessel to a lien for supplies. United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. We cannot see that these decisions warrant the imposition of a personal obligation upon a shipowner by an unauthorized agent. The charterer who was bound to pay the stevedoring charges had no power to bind the owner. The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512. Indeed, the claim of the libelant appears like an afterthought, for Starita, in a letter written on behalf of Starita Company to Grosos as late as March 19, 1923, said that the Algerian American Line, Inc., had not paid Starita Company for work done on the steamers to the amount of about $27,000, and remarked: "As the A. A. L. I. have discontinued their service this money is in all probability lost." At that time he evidently saw the relations with Havraise in their true light and regarded the claim of Starita Company as worthless because it was enforceable only against Algerian, his own unsuccessful corporation.

But aside from the objection to libelant's claim that Algerian had no authority to bind Havraise and in fact contracted only in its own right, there is the further obstacle to recovery that the contract between Starita Company and Algerian was under seal and that Havraise was not a party to it. A principal is not liable under a sealed instrument unless he appears by its terms to be a party. Williams v. Gillies, 75 N. Y. 197; Restatement of the Law of Agency, American Law Institute, Tentative Draft No. 4, § 380. The fact that the stevedoring contract did not bear the seal of Algerian does not prevent it from being a sealed instrument. It bore the seal of the Starita Company, and recited that it was under seal. In such cases "the party whose seal is not attached is to be regarded as having adopted the seal which has been affixed, and therefore as making the contract one under seal." Cammack v. Slattery & Bro., Inc., 241 N. Y. at page 45, 148 N. E. 781, 782; Rusling v. Union Pipe & Constr. Co., 5 App. Div. 448, 39 N. Y. S. 216, affirmed 158 N. Y. 737, 53 N. E. 1131; Restatement of the Law of Contracts, American Law Institute, §§ 97, 98.

Though the libel did not set up the sealed instrument, or seek in so many words to recover damages for its breach, it was necessary to prove it in order to establish libelant's case. Where a contract is made by an agent under seal, but in his own name, the law will not imply an additional contract as a basis for allowing recovery against the principal, though he be disclosed. Spencer v. Huntington, 100 App. Div. 463, 91 N. Y. S. 561, affirmed on opinion below 183 N. Y. 506, 76 N. E. 1109; Henricus v. Englert, 137 N. Y. 488, 33 N. E. 550; Schaefer v. Henkel, 75 N. Y. 378; Briggs v. Partridge, 64 N. Y. 357, 21 Am. Rep. 617; Kiersted v. O. & A. R. R. Co., 69 N. Y. 343, 25 Am. Rep. 199; Huntington v. Knox, 7 Cush. (Mass.) 371.

Judgment affirmed.